## In re AMERICA WEST AIRLINES, INC., Debtor.

## Bankruptcy No. B–91–07505–PHX–RGM.

United States Bankruptcy Court,
D. Arizona.

April 15, 1994.

---

Carl A. Eklund, LeBoeuf, Lamb, Greene & MacRae, Denver, CO, for debtor.

Don C. Fletcher, U.S. Trustee's Office, Phoenix, AZ.

Allen Corotto, Reorganization Branch Chief, S.E.C., San Francisco, CA, for S.E.C.

Michael McGrath, Mesch, Clark & Rothschild, Tucson, AZ, for Steinhardt Group.

Sander L. Esserman, Stutzman and Bromberg, Dallas, TX, for Indenture Trustee Texas Commerce Bank.

Benjamin Waisbren, Lord, Bissel & Brook, Chicago, IL, for Equity Sec. Holders Committee.

Patrick Murphy, Murphy, Weir & Butler, San Francisco, CA, for Unsecured Creditors Committee.

Arnold M. Quittner, Stroock & Stroock & Lavan, Los Angeles, CA, for Trans Pacific Enterprises & Ansett Industries.

Cary William Clew, Milbank, Tweed, Hadley & McCloy, Los Angeles, CA, for Kowasaki Leasing.

Jon S. Musial, Snell & Wilmer, Phoenix, AZ, for Boeing.

Richard Schifter, Arnold & Porter, Washington, DC, for AmWest Partners.

William Novotny, Mariscal, Weeks, McIntyre & Friedlander, Phoenix, AZ, for GPA.

Susan M. Freeman, Lewis and Roca, Phoenix, AZ, for Aircraft Leasing Creditors.

## OPINION AND ORDER RE INTERIM PROCEDURES AND DENYING BREAK–UP FEES

ROBERT G. MOOREMAN, Chief Judge.

This matter is before the Court pursuant to Debtor's Motion for Approval of the Interim Procedures Agreement and the objection thereto. An evidentiary hearing was required and held on April 12, 1994, after which the matter was taken under advisement. After due consideration of the pleadings, the evidence presented, the argument of counsel, the record herein, and the Securities and Exchange Commission letter dated April 14, 1994, written by Allen Corotto, filed and docketed on April 14, 1994, and under the present posture of the case, the Court finds and concludes the following in making its decision.

1. On December 8, 1993, the Court entered its Order on the Motion to Establish Procedure for Submission of Investment Proposals (the "Investment Procedure Order"). The Investment Procedure Order approved a stipulation between America West, the Official Committees, and Texas Commerce Trust Company, N.A., which provided that if the Lead Plan Proposal selected by America West was made by a third party, that party "will be entitled to reasonable bidding protections, which may include topping fees, break-up fees, and reimbursement of expense."

2. On February 24, 1994, America West selected a proposal submitted by AmWest Partners, L.P. ("AmWest") as the Lead Plan Proposal.

3. On March 11, 1994, America West filed its Motion for Approval of Interim Procedures Agreement.

4. The Motion for Approval of Interim Procedures Agreement was set for hearing on March 16, 1994. At the March 16, 1994 hearing, the Motion for Approval of Interim Procedures Agreement was continued to March 28, 1994.

5. Between March 16, 1994, and March 28, 1994, the Interim Procedures Agreement was revised after negotiations between America West, AmWest, and the Creditors Committee.

6. At the March 28, 1994 hearing, the Court set an evidentiary hearing for April 12, 1994, on the Interim Procedure Agreement and the issue of the break-up fees.

7. Between March 28, 1994, and April 12, 1994, further negotiations were held between America West, AmWest, the Creditors Committee and the Equity Committee which resulted in an executed Second Revised Interim Procedures Agreement. This revised agreement still contained the provision regarding the 4 million dollar break-up fee for breach by the Debtor prior to approval of a disclosure statement. In addition and in regard to a possible 8 million dollar break-up fee due under certain contingencies after approval of a disclosure statement, the parties to the revised agreement agreed to allow the Court to determine the proper break-up fee in the range of 4 to 8 million dollars.[1]

Research teaches us that break-up fees are a relatively recent addition in the area of bankruptcy law. The use of such fees in the bankruptcy context has been the result of the so-called "mega-cases" of the late 1980's and early 1990's. A break-up fee is an incentive payment to a prospective purchaser with which a company fails to consummate a transaction. *In re Integrated Resources, Inc.*, 147 B.R. 650, 653 (S.D.N.Y.1992).

Prior to the "mega-cases," break-up fees have existed outside of bankruptcy for some time in mergers and acquisitions. In the non-bankruptcy context, these type of fees

1. Debtor's counsel submitted an alternative proposal in letter form on April 15, 1994, reducing the break-up fee from 4 million dollars to 3 million dollars and increasing the total possible reimbursement of expenses from 3 million dollars to 4 million dollars. Counsel for objecting parties Transpacific Enterprises and Ansett Enti-

ties filed a responsive letter regarding the alternative proposal on April 15, 1994. The changes in the alternative proposal, although appreciated by the Court and deemed to be in good faith, are not substantial or material and are therefore rejected for the reasons herein.

are used for many purposes, and often to attract bidders. Non-bankruptcy courts have typically denied the use of break-up fees where such fees were the product of bad faith or would chill bidding. *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.*, 506 A.2d 173, 183–85 (Del.1986).

■ Break-up fee arrangements outside bankruptcy are presumptively valid as an exercise of business judgment. See, *e.g.*, *Cottle v. Storer Communications, Inc.*, 849 F.2d 570 (11th Cir.1988); *CRTF Corp. v. Federated Department Stores*, 683 F.Supp. 422 (S.D.N.Y.1988); *Samjens Partners I v. Burlington Industries*, 663 F.Supp. 614 (S.D.N.Y.1987). To this point, Bankruptcy Courts have entertained break-up fees under the "business judgment" rule, following the analysis used by non-bankruptcy courts. See *In re Integrated Resources, Inc.*, 147 B.R. 650 (S.D.N.Y.1992); *In re 995 Fifth Ave. Assoc., L.P.*, 96 B.R. 24 (Bankr.S.D.N.Y. 1989). However, on further analysis, problems can arise when Bankruptcy Courts blindly follow non-bankruptcy courts' application of the business judgment rule to break-up fees.

■ Acquisition of an ongoing business which is in bankruptcy is fundamentally different from that of an acquisition involving parties not in bankruptcy. These differences effectively undercut any wholesale adoption of non-bankruptcy procedures in the bankruptcy context. Outside of bankruptcy, bidding protections, including break-up fees, are often utilized because of the uncertainty which exists when corporate shareholders must approve mergers and acquisitions. Mergers and acquisitions which are outside of the ordinary course of business require Court approval in the bankruptcy court.

The leading case on break-up fees is *In re Integrated Resources, Inc.*, 135 B.R. 746 (Bankr.S.D.N.Y.1992), aff'd, 147 B.R. 650 (S.D.N.Y.1992), app. dismissed, 3 F.3d 49 (2d 1993) (dismissed on jurisdictional grounds). In *Integrated*, the Bankruptcy Court relied on the business judgment rule to allow a break-up fee. Initially, the debtor-in-possession attempted to propose a plan funded by its own operations. 135 B.R. at 748. This was unsuccessful, causing the debtor to look elsewhere for funding for a plan of reorgani-

zation. The debtor approached Bankers Trust, which was interested in lending Integrated 565 million dollars, but wanted assurances of a loan closing before commitment. *Id.* at 752. The assurances took the form of an agreement granting a break-up fee and provided for expense reimbursement. The break-up fee was in the range of 1.25 million to 6 million dollars depending on the timing of certain occurrences. The debtor sought approval of this agreement before entering into the financing agreement with Bankers Trust. *Id.* The Bankruptcy Court approved the proposed agreement, citing non-bankruptcy cases to support the proposition that break-up fees are allowable in the bankruptcy context. The Court in *Integrated* went as far as to recognize there exists a difference between acquisitions in bankruptcy and outside of bankruptcy, but went no further. The New York Bankruptcy Court stated its standard for analyzing break-up fees in the bankruptcy context as follows:

> When a sale of the debtor's assets outside the ordinary course of business is proposed, Code 363, bankruptcy courts will carefully scrutinize the use of break-up fees. This is because bidding incentives impose expenses on the debtor's estate, and do not merely affect shareholders as in the corporate control cases, but affect the debtor, creditors and equity holders, alike.

*Id.* at 750–51.

The New York Bankruptcy Court did not explain what it meant by "careful scrutiny." In fact, after the Court enumerated its own "careful scrutiny" test, it then went back to a non-bankruptcy mode and approved the break-up fee as a valid exercise of business judgment by the debtor.

On appeal, the District Court affirmed the Bankruptcy Court on the basis of the lower Court's application of the business judgment rule. 147 B.R. at 657. It appears from the reported opinions that neither Court performed any in-depth analysis regarding the applicability of the business judgment rule to break-up fees in the bankruptcy context. The District Court did not discuss section 363(b) of the Bankruptcy Code. Additionally, the District Court did not address the fact that there are differences between a debtor-

in-possession and non-debtors. It is this Court's opinion that both Courts which addressed the break-up fees in *Integrated* failed to adequately address 363(b) and the differences between debtors-in-possession and non-debtors. This Court finds and concludes that therefore neither opinion is persuasive or applicable to the situation involving America West and AmWest. Additionally, this Court's opinion herein adopts and approves of the reasoning enumerated in the law review article, Bruce A. Markell, *The Case Against Breakup Fees in Bankruptcy*, 66 THE AMERICAN BANKRUPTCY LAW JOURNAL 349 (Fall, 1992).

In other words, this Court declines to follow other Bankruptcy Courts' opinions where break-up fees are treated as another topic of corporate negotiation without reference to what in fact is in the best interests of the estate. The type of transaction described in *Integrated* and also involved in the America West and AmWest context is to this Court clearly out of the ordinary course of business. When a transaction is out of the ordinary course of business, after notice and a hearing, it falls to the Bankruptcy Court to determine whether to approve the transaction based on the facts and history of the case. 11 U.S.C. 363(b).

In a transaction of the size and nature proposed here, the Court must take into consideration what is in the best interests of the estate. *In re Wilde Horse Enterprises, Inc.*, 136 B.R. 830, 841 (Bankr. C.D.Cal.1991). As stated, the standard is not whether a break-up fee is within the business judgment of the debtor, but whether the transaction will "further the diverse interests of the debtor, creditors and equity holders, alike." *In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir.1983). The proposed break-up fee must be carefully scrutinized to insure that the Debtor's estate is not unduly burdened and that the relative rights of the parties in interest are protected. *In re Hupp Industries, Inc.*, 140 B.R. 191, 196 (Bankr.N.D.Ohio 1992). The analysis conducted by the Court must therefore include a determination that *all* aspects of the transaction are in the best interests of all concerned.

The Debtor, AmWest, the Creditors Committee, the Equity Committee and their re-spective witnesses, as well as existing case law such as Integrated, all trumpeted the need for a break-up fee as a necessary inducement for bidders and for bidding generally. The testimony of William Franke, Chairman of the Board of Directors and CEO of America West Airlines, Inc., Kenneth Viellieu, an Investment Banker with Donaldson, Lufkin & Jenrette Securities Corporation, a financial advisor to the Debtor, Henry Miller, an Investment Banker with Salomon Brothers, Inc., the financial advisor to the Equity Committee and James Coulter, a principal of AmWest Genpar, Inc., the general partner of AmWest Partners, L.P., all echoed this same sentiment. In contrast to this assertion, both Investment Bankers, Mr. Viellieu and Mr. Miller, emphatically stated that America West had been "thoroughly marketed," resulting in the Lead Plan Proposal by AmWest.

The testimony of the two Investment Bankers and Mr. Franke show this to be the case. America West has been marketed to approximately one hundred potential bidders. These potential bidders included members of the airline industry and other major corporations. Donaldson, Lufkin & Jenrette and Salomon Brothers worked together in marketing America West to produce bidders. The Debtor also took steps to arouse outside interest in the airline. The strategy worked, producing four bids at the February 24, 1994 meeting of America West's Board of Directors at which one of AmWest's bids was chosen as the Lead Plan Proposal. To get to this point in the reorganization process, America West has been "thoroughly marketed."

The record also reflects that the parties view the proposed break-up fee as liquidated damages in the event the Debtor breaches its agreement with AmWest. Liquidated Damages cannot be paid as an administrative expense under 11 U.S.C. § 503 because section 503(b) only allows payment of administrative expense claims which are for "actual" expenses that were incurred that were also beneficial to a Debtor's estate. *In re Hupp*, 140 B.R. at 196. As liquidated damages, the proposed break-up fee does not meet the standard of section 503 because it is

not correlated to any transactional cost or expense incurred by the negotiating bidder.

America West and AmWest now seek Court approval of the Interim Procedures Agreement. This document is supposed to govern the dealings between America West and AmWest as this case progresses towards confirmation. Under the Interim Procedures Agreement, AmWest is to be paid a 4 million dollar break-up fee if the agreement is breached by America West before approval of a disclosure statement. If certain enumerated occurrences happen after approval of a disclosure statement, AmWest has the right to seek up to 8 million dollars from the Court as a break-up fee.

■ If all or part of the break-up fee contemplated in the agreement became due and owing to AmWest, the debtor's estate would be required to come up with funds to pay the fee. This Court has the jurisdiction and responsibility to determine if the proposed break-up fee, and the transaction as a whole, make economic sense for all concerned. The Court finds and concludes that payment of the contemplated break-up fee, in any amount, is not in the best interest of the estate, the creditors or the equity holders. The Court further finds and concludes that America West has been thoroughly marketed and that the proposed break-up fee will not induce further bidding or bidding generally. The Court further finds and concludes that the proposed break-up fee unnecessarily chills bidding and potentially depletes estate assets that can be better utilized to help fund a plan of reorganization and continue to provide funds for professionals, attorneys, accountants and consultants to that end.

■ The proposed break-up fee in this case is not economically reasonable in this mega type bankruptcy case. Here we have a very large number of creditors, bondholders and shareholders, including employees of America West who were required to purchase stock as part of their employment. No funds of the estate should be used to pay break-up fees in a transaction that on this record would appear to yield a large profit to the top bidder. Instead, the estate should be preserved because as much money as possible should be available to the creditors, bondholders, and shareholders under a consensual plan of reorganization. Bankruptcy case assets are tantamount to trust property. Here, the Court has allowed and the debtor has already paid very substantial administrative costs which have burdened the debtor and effectively depleted estate assets to get us to this stage of the case. It is not appropriate at this time in this case to allow potential asset depletion for such a valuable going concern which is now on the verge of profitability.

At the April 12, 1994, hearing, it was brought up that a 9 million dollar break-up fee was approved by another Court in this District in the Circle K bankruptcy. Nothing regarding the break-up fee in the Circle K case has been published or has any precedential value. Nonetheless, the facts in Circle K make it inapplicable to the America West case. America West has been profitable over the last three quarters and there is no need to induce bidding for this company. No showing has been made that Circle K was similarly situated.

■ Were this Court to hold that the business judgment rule was applicable to break-up fees in bankruptcy cases without reference to anything else, Court approval would still be required on the reasonableness thereof because of the administrative expense exposure to the estate in the event the break-up fee would come into play. Based on the analysis above, this Court would reach the same conclusion and find that the proposed break-up fee is not in the best interest America West's bankruptcy estate, its creditors, bondholders or shareholders.

■ In the final analysis, the Interim Procedures Agreement also calls for reimbursement of expenses in the amount of $250,000 per month, up to 3 million dollars, subject to Court approval. This reimbursement provision allows significant and fair treatment of a third party bidder. The Court finds and concludes that the sections of the Interim Procedure Agreement that allow AmWest reimbursement of expenses as deemed reasonable by the Court are in the best interest of the estate. The Court further finds and concludes that all sections of the Interim Procedures Agreement except those dealing with break-up fees are in the

best interest of the estate. Also, in closure, in his letter dated April 14, 1994, Allen F. Corotto of the Securities and Exchange Commission recommends the Court scrutinize the pre-March 1, 1994 expense allowance of up to $550,000 as it will scrutinize the post-March 1, 1994 monthly expenses. Currently the pre-March 1, 1994 expenses are subject only to the approval of the Debtor. The Court adopts this recommendation as consistent with the entire analysis.

Accordingly,

IT IS ORDERED granting in part and denying in part Debtor's Motion.