

1999 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-19-1999

# In Re: O'Brien Env

Precedential or Non-Precedential:

Docket 98-6151

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1999

Recommended Citation
"In Re: O'Brien Env" (1999). *1999 Decisions.* Paper 208.
http://digitalcommons.law.villanova.edu/thirdcircuit_1999/208

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1999 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed July 19, 1999

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 98-6151

IN RE: O'BRIEN ENVIRONMENTAL ENERGY, INC.,
        Debtor

CALPINE CORPORATION,
        Appellant

v.

O'BRIEN ENVIRONMENTAL ENERGY, INC.,
now known as NRG GENERATING (U.S.), INC.

On Appeal from the United States District Court
for the District of New Jersey
(D. C. No. 97-cv-01554)
District Judge: Honorable Joseph A. Greenaway, Jr.

Argued April 7, 1999

Before: SLOVITER, ALITO and ALARCON,*
Circuit Judges

(Filed: July 19, 1999)

Michael R. Griffinger (Argued)
Gibbons, Del Deo, Dolan,
 Griffinger & Vecchione
Newark, N.J. 07102

_____

* Honorable Arthur L. Alarcon, Senior Circuit Judge, United States Court
of Appeals for the Ninth Circuit, sitting by designation.

James A. Scarpone
Hellring, Lindeman, Goldstein
 & Siegal
Newark, N.J. 07102

 Attorneys for Appellant

Craig J. Donaldson
Riker, Danzig, Scherer, Hyland
 & Perretti
Morristown, N.J. 07962

Jeff J. Friedman (Argued)
Rosenman & Colin
New York, N.Y. 10022

Mitchell A. Karlan (Argued)
Gibson, Dunn & Crutcher
New York, N.Y. 10166

 Attorneys for Appellees

OPINION OF THE COURT

SLOVITER, Circuit Judge.

Calpine Corporation appeals from the order of the District Court affirming the Bankruptcy Court's decision not to award it a break-up fee or expenses in connection with its unsuccessful bid to acquire O'Brien Environmental Energy, Inc. ("O'Brien"), the Debtor in a Chapter 11 bankruptcy proceeding. The term "break-up fee" refers to a fee paid by a seller to a prospective purchaser in the event that a contemplated transaction is not consummated. This appears to be the first court of appeals decision to consider the standards that should govern an award of break-up fees and related expenses in the bankruptcy context.

I.

The facts of this case are largely undisputed. O'Brien at one time developed cogeneration, waste-heat recovery and biogas projects for the production of thermal and electrical energy. On September 28, 1994, it filed for Chapter 11

2

protection and began operating as a debtor-in-possession under 11 U.S.C. S 1107. John Kelly and Glass & Associates, a crisis management firm, provided O'Brien with interim management services.

In February 1995, Kelly, Arthur Anderson, and counsel for O'Brien decided to proceed with a sale of all or almost all of O'Brien's assets rather than attempt to continue operating O'Brien as a going concern. Representatives of O'Brien contacted over 300 potential buyers, and approximately 125 expressed interest. The representatives then gathered publicly available information about O'Brien in "war rooms" in Philadelphia and New York. Potential buyers were given access to the rooms upon the signing of a confidentiality agreement.

Roughly fifty potential buyers signed agreements and were given access. Approximately nineteen later formally expressed an interest in purchasing the company, and ten submitted bids. In May, seven were invited to improve their bids, finish due diligence, and complete term sheets. At least five submitted bids to the Debtor, the Equity Committee, and the Official Unsecured Creditors' Committee (the "Creditors' Committee") and made elaborate oral, written, and videotaped presentations. Of the submissions received, three were deemed highest and best: those of Calpine, NRG Energy, Inc. ("NRG"), and Destec Corp.

On July 10, 1995, O'Brien entered into a binding and guaranteed purchase agreement with Calpine. The agreement provided for the sale of O'Brien's business and the transfer of $90 to $100 million of O'Brien's liability to Calpine. The agreement did not provide for any payment to O'Brien's existing shareholders and did not even provide for full payment to creditors. See App. at 311. Significantly for purposes of this appeal, Calpine's obligation to perform under the contract was conditioned on the parties' ability to secure the approval by the Bankruptcy Court of a break-up fee of $2 million and expenses up to approximately $2 million to be paid to Calpine under certain circumstances. See App. at 185-89.

O'Brien filed a motion in the Bankruptcy Court for such

approval on July 7, 1995. The Bankruptcy Court considered the motion at a hearing held on August 17, 1995. The Debtor, the Creditor's Committee, O'Brien's secured creditors, and several unsecured creditors each supported the motion; the Equity Committee, Wexford Management LLC ("Wexford") (O'Brien's controlling shareholder), and NRG opposed it.[1]

The Bankruptcy Court refused to approve the break-up fee and expense provisions, expressing concern that allowing such fees and expenses would "perhaps chill or at best certainly complicate the competitive bidding process." App. at 643. The court indicated that it would be willing to permit Calpine to seek a break-up fee and expenses at the end of the process, but Calpine replied that it would not go forward absent the buyer protection it had sought. The court adjourned the hearing until August 25, 1995. See App. at 643-45.

Notwithstanding its position at the hearing, Calpine soon decided to reenter the bidding. On August 25, 1995, all the major parties agreed upon bidding procedures, and, on August 30, 1995, an order was entered by consent that, inter alia, approved a modified version of the Calpine contract. The order stated, in part, "Calpine's right to request approval from the Court of the allowance and payment of a Break-Up Fee and Break-Up Expenses is hereby reserved." App. at 694-95. The order further provided, "[S]hould the [Calpine Contract] be terminated pursuant to Section 14.1(g) thereof, or the Court confirm a Plan-based Bid other than Calpine's . . . , the Official Committee of Unsecured Creditors . . . , certain of the Debtor's secured creditors, . . . as well as Mr. John Kelly in

_____

1. It is not entirely clear from the record whether it was Wexford or Kelly
who was authorized to speak for the Debtor at the August 17, 1995 hearing. The brief filed for Wexford, O'Brien's largest shareholder, contends it had control of the Board of Directors at that time. See Appellees Cogeneration Corp. and Wexford's Br. at 8. The issue was litigated, but the litigation resulted in a practical compromise rather than a ruling of law. In any event, our resolution of the issues raised by this appeal does not turn on a resolution of this controversy, and we refer to the position taken by John Kelly as that of the Debtor merely for convenience.

4

his capacity as the Debtor's Chief Administrative Officer, shall support the allowances and payment of such Break-up Fee and Break-up Expense." App. at 695.

An auction followed during which Calpine and NRG competed, but NRG filed the last enhanced bid, which the court deemed to be the last, best offer. Prior to confirmation of NRG's plan, Calpine filed an Application for Payment of Fees and Expenses Pursuant to 11 U.S.C. S 503(b), seeking a $2 million break-up fee, $2,250,000 in break-up expenses, and interest at the prime rate from January 15, 1996 through payment of the fee and expenses. NRG, Wexford, and the Equity Committee objected to Calpine's application; the Creditors' Committee, which had been Calpine's supporter from the outset, supported it.

At a hearing held on June 6, 1996, the Bankruptcy Court overruled objections to Calpine's right to present an application seeking fees, and on August 28, 1996, it held an evidentiary hearing on Calpine's application. On November 8, 1996, the Bankruptcy Court filed a comprehensive opinion denying Calpine's application and entered the Order on November 27, 1996.

Calpine appealed to the United States District Court for the District of New Jersey, which denied Calpine's appeal by a brief order dated May 29, 1998. Calpine thenfiled a timely appeal with this court, challenging both the Bankruptcy Court's decision on August 17, 1995 not to approve the proffered contract between the Debtor and Calpine and the court's November 27, 1996 order denying Calpine's motion for a break-up fee and expenses.

II.

At the outset, we address Appellees' contention that Calpine lacks standing to challenge the Bankruptcy Court's August 17, 1995 decision and that, therefore, that ruling is not before us on this appeal. Appellees reason that because only the debtor, O'Brien, had statutory authority to move for approval of the contract provisions at the August hearing, only O'Brien may appeal the denial of approval.

This court has emphasized that appellate standing in bankruptcy cases is limited to "person[s] aggrieved."

Travelers Ins. Co. v. H.K. Porter Co., 45 F.3d 737, 741 (3d Cir. 1995). We consider a person to be "aggrieved" only if the bankruptcy court's order "diminishes their property, increases their burdens, or impairs their rights." General Motors Acceptance Corp. v. Dykes (In re Dykes), 10 F.3d 184, 187 (3d Cir. 1993). Thus, only those "whose rights or interests are directly and adversely affected pecuniarily" by an order of the bankruptcy court may bring an appeal. Id. (internal quotation marks omitted).

The "person aggrieved" standard, which is more stringent than the constitutional test for standing, serves the acute need to limit collateral appeals in the bankruptcy context. Id. As the Court of Appeals for the Ninth Circuit explained:

> This need [to limit appeals] springs from the nature of bankruptcy litigation which almost always involves the interests of persons who are not formally parties to the litigation. In the course of administration of the bankruptcy estate disputes arise in which numerous persons are to some degree interested. Efficient judicial administration requires that appellate review be limited to those persons whose interests are directly affected.

Fondiller v. Robertson (In re Fondiller), 707 F.2d 441, 443 (9th Cir. 1983).

The question whether a party has standing to appeal in a bankruptcy case is generally an issue of fact for the district court. See In re Dykes, 10 F.3d at 188. The underlying order in this case does not indicate whether the District Court considered Calpine's appellate standing. Because the facts of this case are not in dispute, however, it is appropriate for us to address this issue in the first instance.

Courts that have considered appellate standing in the context of the sale or other disposition of estate assets have generally held that creditors have standing to appeal, but disappointed prospective purchasers do not. See, e.g., Licensing by Paolo, Inc. v. Sinatra (In re Gucci) , 126 F.3d 380, 388 (2d Cir. 1997); see also In re Nepsco, Inc., 36 B.R. 25, 26–27 (Bankr. D. Me. 1983). We see no reason to hold differently in this case.

6

On August 17, 1995, Calpine concededly was not a creditor of O'Brien's estate. Nor did Calpine have a binding contract with O'Brien, as the sale of substantially all of a debtor's assets is a transaction outside of the ordinary course of business, which requires bankruptcy court approval to become effective. See 11 U.S.C.S 363(b); Northview Motors, Inc. v. Chrysler Motors Corp., No. 98-3387, 1999 WL 398881, at *4 (3d Cir. June 18, 1999). Nor does Calpine's appeal challenge either the "intrinsic fairness" of the process by which O'Brien's assets were sold or the good faith of NRG as the ultimate purchaser. See Kabro Assocs., LLC v. Colony Hill Assocs. (In re Colony Hill Assocs.), 111 F.3d 269, 274 (2d Cir. 1997).

In this circumstance, we cannot conclude that the Bankruptcy Court's decision diminished Calpine's property, increased its burdens, or impaired its rights. See In re Dykes, 10 F.3d at 187. The only rights Calpine had on August 17, 1995 were the right to require O'Brien to seek approval by the Bankruptcy Court as per its contract and the right to enforce the contract if such approval was secured. The first right was duly exercised when O'Brien moved for approval at the August hearing; the second right never became exercisable because the condition precedent to its enforcement never occurred. Thus, neither of Calpine's rights was impaired by the Bankruptcy Court's decision to deny approval.

Moreover, the order disapproving Calpine's contract lessened, rather than increased, Calpine's burdens: it relieved Calpine of any contractual duty to perform. Finally, Calpine's loss of the profit it hoped to gain from acquiring O'Brien is too speculative a harm to constitute injury to property for purposes of the standing test. See, e.g., In re Colony Hill Assocs., 111 F.3d at 273; Davis v. Seidler (In re HST Gathering Co.), 125 B.R. 466, 468 (W.D. Tex. 1991). We, therefore, hold that Calpine lacks standing to appeal the August 17, 1995 order of the Bankruptcy Court. 2

_____

2. In light of our decision, we need not decide whether Calpine failed to preserve its appeal by not filing a notice of appeal from the August 17, 1995 order.

III.

A.

Calpine also appeals the Bankruptcy Court's order of November 27, 1996 denying Calpine's subsequent motion for a break-up fee and expenses. The parties concede that it has standing on this issue. There is, nonetheless, some confusion concerning the legal basis on which Calpine made and is prosecuting that motion. Calpine originally captioned its motion under 11 U.S.C. S 503(b). At the argument before the Bankruptcy Court on June 6, 1996, Calpine's counsel stated: "We are not proceeding pursuant to 503(b)," although counsel also expressed belief that Calpine satisfied the requirements of that provision. App. at 1027. In reaching its determination, the Bankruptcy Court stated: "Calpine . . . is not proceeding here under S 503(b) or the traditional administrative expense claim analysis set forth in S 503(b). Instead, the request is made under the applicable case law setting [forth] standards for approval of break-up fees and break-up expenses . . . ." In re O'Brien Environmental Energy, Inc., No. 94-26723, slip op. at 30 (Bankr. D.N.J. Nov. 8, 1996). Calpine raises no challenge to this portion of the Bankruptcy Court's ruling.

Neither Calpine nor the Bankruptcy Court have cited any support for the proposition that courts may create a right to recover from the bankruptcy estate where no such right exists under the Bankruptcy Code. Nor have we found any support for that proposition. The structure of the Bankruptcy Code further counsels against judicial expansion of the potential for recovery from the debtor's estate. The filing of a petition for bankruptcy protection under Chapter 11 of the Code creates an estate, consisting of all property in which the debtor holds an interest, see 11 U.S.C. SS 301, 541, 1101, and precludes all efforts to obtain or distribute property of the estate other than as provided by the Bankruptcy Code, see 11 U.S.C. SS 362, 363, 1123. This statutory control over the right to recover property from the debtor's estate is integral to the purposes and goals of federal bankruptcy law. See, e.g., City of New York v. Quanta Resources Corp. (In re Quanta Resources Corp.), 739 F.2d 912, 915 (3d Cir. 1984) ("The objectives of federal

8

bankruptcy law can be broadly stated: to provide for an equitable settling of creditors' accounts by usurping from the debtor his power to control the distribution of his assets.").

Respectful of this statutory background, we decline the invitation to develop a general common law of break-up fees. We instead consider whether any provision of the Bankruptcy Code, as it is currently written, authorizes the award of break-up fees and expenses to an unsuccessful bidder at the plan-based sale of a debtor's assets.

B.

The most likely source of authority for Calpine's motion appears to be 11 U.S.C. S 503, the provision on which its motion originally relied. The parties concede that any right Calpine may have to recover from O'Brien's estate arose after O'Brien filed for bankruptcy protection and began marketing its assets for sale. Further, claims that arise after the date on which the debtor petitioned for bankruptcy protection ("post-petition claims") are generally allowed, if at all, only as administrative expenses pursuant to 11 U.S.C. S 503. We, therefore, treat Calpine's arguments as addressing whether it is entitled to receive break-up fees and expenses under that provision.

Section 503 states, in relevant part:

> (a) an entity may timely file a request for payment of an administrative expense, or may tardily file such a request if permitted by the court for cause.
>
> (b) After notice and a hearing, there shall be allowed administrative expenses, . . . including --
>
> (1) (A) the actual, necessary costs and expense s of preserving the estate . . . .

"For a claim in its entirety to be entitled tofirst priority under [S 503(b)(1)(A)], the debt must arise from a transaction with the debtor-in-possession. . . .[and] the consideration supporting the claimant's right to payment [must be] beneficial to the debtor-in-possession in the operation of the business." Cramer v. Mammoth Mart, Inc.,

9

(In re Mammoth Mart, Inc.), 536 F.2d 950, 954 (1st Cir. 1976). The Bankruptcy Court noted: "A party seeking payment of costs and fees as an administrative expense must . . . carry the heavy burden of demonstrating that the costs and fees for which it seeks payment provided an actual benefit to the estate and that such costs and expenses were necessary to preserve the value of the estate assets." In re O'Brien, slip op. at 30.

We assume that bidding at the sale of O'Brien's assets constitutes a transaction with the debtor-in-possession for purposes of S 503(b)(1)(A). This assumption is particularly appropriate here in light of the Bankruptcy Court's order of August 30 1995, which, by "reserving" Calpine's rights, suggests that the court anticipated and intended to preserve consideration of a later request for feesfiled by Calpine. Such fees could be awarded under this section only if Calpine's participation in the bidding process was necessary to accord the estate an actual benefit.

Calpine argues that, much like in non-bankruptcy contexts, break-up fees should be permitted where, after careful scrutiny, the court determines that (1)"a debtor believes in its business judgment that such fees will benefit the estate," (2) there is no proof of self-dealing, and (3) there is no proof of specific harm to the bankruptcy estate. Appellant's Br. at 21.

The bankruptcy courts and district courts that have addressed the standard for break-up fees and expenses in bankruptcy proceedings have adopted very different approaches. Some have assumed that break-up fees and expenses should be treated in bankruptcy the same way that they are treated in the corporate world, as Calpine contends. In In re 995 Fifth Avenue Associates, L.P., 96 B.R. 24 (Bankr. S.D.N.Y. 1989), the debtor, the Creditors' Committee, and a potential purchaser negotiated a form contract that provided for the payment of $500,000 in break-up fees and served as the basis for an auction of the company. In ruling on a request to recover the fees following the auction, the bankruptcy court began by reviewing the treatment of break-up fees outside of bankruptcy. It stated:

10

In the corporate takeover context it is recognized that breakup fees are not illegal where they enhance rather than hamper the bidding. Breakup fees and other strategies may "be legitimately necessary to convince a `white knight' to enter the bidding by providing some form of compensation for the risks it is undertaking." When reasonable in relation to the bidder's efforts and to the magnitude of the transaction, breakup fees are generally permissible. But if such a fee is too large, it may chill the bidding to the detriment of shareholders (or, if the company for sale is insolvent, its creditors). In such instances, the fee is not protected by the business judgment rule (which bars judicial inquiry into actions of corporate directors taken in good faith and in the exercise of honest judgment in the lawful and legitimate furtherance of corporate purposes) and is thus subject to court review.

Id. at 28 (citations omitted). The court concluded that "[t]hese principles have vitality by analogy in the chapter 11 context," and upheld payment of the break-up fees. Id. (footnote omitted).

The District Court for the Southern District of New York followed a similar approach in Official Committee of Subordinated Bondholders v. Integrated Resources, Inc., 147 B.R. 650 (S.D.N.Y. 1992). There, the debtor moved for authorization under S 363 to enter into a letter agreement with a prospective lender. Under the contract, the lender would agree to fund the debtor's plan of reorganization in return for assurances that it would receive reimbursement of its expenses and a break-up fee should the transaction not go forward. Although the Subordinated Bondholders' Committee objected to the reimbursement and break-up fee provisions, the bankruptcy court approved the lender's proposal, deferring to the debtor's business judgment. On appeal, the district court identified three questions that a court should ask in deciding whether to approve break-up fee provisions: "(1) is the relationship of the parties who negotiated the break-up fee tainted by self-dealing or manipulation; (2) does the fee hamper, rather than encourage bidding; [and] (3) is the amount of the fee unreasonable relative to the proposed purchase price?" Id.

11

at 657. Because it found that the bankruptcy court had properly answered each of these questions in the negative, the district court affirmed.

Other courts have authorized more searching review, identifying numerous factors that a court should consider in determining whether a break-up fee is permissible in the context of any particular bankruptcy. In In re Hupp Industries, Inc., 140 B.R. 191 (Bankr. N.D. Ohio 1992), the debtor sought authorization to enter into a letter of intent that would have provided for the sale of many of the debtor's assets under 11 U.S.C. S 363 and obligated the debtor to pay up to $150,000 in break-up fees and expenses if the deal were not consummated. The Creditors' Committee and a principal secured creditor objected. The court identified seven "[s]ignificant factors to be considered in determining the propriety of allowing break-up fee provisions" in the context of "a major preconfirmation transaction":

> (1) Whether the fee requested correlates with a maximization of value to the debtor's estate;
>
> (2) Whether the underlying negotiated agreement is an arms-length transaction between the debtor's estate and the negotiating acquirer;
>
> (3) Whether the principal secured creditors and th e official creditors committee are supportive of the concession;
>
> (4) Whether the subject break-up fee constitutes a fair and reasonable percentage of the proposed purchase price;
>
> (5) Whether the dollar amount of the break-up fee is so substantial that it provides a "chilling effect" on other potential bidders;
>
> (6) The existence of available safeguards beneficial to the debtor's estate;
>
> (7) Whether there exists a substantial adverse imp act upon unsecured creditors, where such creditors are in opposition to the break-up fee.

Id. at 193, 194.

The court further remarked, "In the context of a nonbankruptcy asset sale, . . . break-up fees are presumptively appropriate in view of the business judgment rule, and thusly, seldom require judicial attention. In the bankruptcy context, however, the Court must be necessarily wary of any potential detrimental effect that an allowance of such a fee would visit upon the debtor's estate." Id. (citation omitted). After"carefully scrutiniz[ing]" the bidding incentives, the court concluded that they "would only be an unwarranted expense upon the Debtor's estate" and refused to approve the agreement. Id. at 196.

Finally, in In re America West Airlines, Inc., 166 B.R. 908 (Bankr. D. Ariz. 1994), the debtor sought approval of an interim procedures agreement that would have provided for payment of between four and eight million dollars in break-up fees. The debtor, the Creditor's Committee, the Equity Committee, and the debtor's prospective contract partner all supported authorization of the agreement. The court, however, refused to apply the business judgment rule, which it recognized had been applied outside of the bankruptcy context, stating: "Acquisition of an ongoing business which is in bankruptcy is fundamentally different from that of an acquisition involving parties not in bankruptcy." Id. at 911. It held:

> [T]he standard is not whether a break-up fee is within the business judgment of the debtor, but whether the transaction will "further the diverse interests of the debtor, creditors and equity holders, alike." The proposed break-up fee must be carefully scrutinized to insure that the Debtor's estate is not unduly burdened and that the relative rights of the parties in interest are protected. The analysis conducted by the Court must therefore include a determination that all aspects of the transaction are in the best interests of all concerned.

Id. at 912.

The court noted that the debtor had been "thoroughly marketed" and concluded that "the proposed break-up fee w[ould] not induce further bidding or bidding generally" but would "unnecessarily chill[ ] bidding and potentially

13

deplete[ ] assets that c[ould] be better utilized to help fund a plan of reorganization and continue to provide funds for professionals, attorneys, accountants and consultants to that end." Id. at 913. It held, "No funds of the estate should be used to pay break-up fees in a transaction that .. . would appear to yield a large profit to the top bidder." Id.

We have reviewed these cases and considered the different approaches they represent. None, however, offers a compelling justification for treating an application for break-up fees and expenses under S 503(b) differently from other applications for administrative expenses under the same provision. We therefore conclude that the determination whether break-up fees or expenses are allowable under S 503(b) must be made in reference to general administrative expense jurisprudence. In other words, the allowability of break-up fees, like that of other administrative expenses, depends upon the requesting party's ability to show that the fees were actually necessary to preserve the value of the estate. Therefore, we conclude that the business judgment rule should not be applied as such in the bankruptcy context. Nonetheless, the considerations that underlie the debtor's judgment may be relevant to the Bankruptcy Court's determination on a request for break-up fees and expenses.

C.

All parties recognize that break-up fees and expenses are accepted in corporate merger and acquisitions transactions. In summarizing the corporate use of break-up fees, Calpine has explained that such provisions are designed to provide a prospective acquirer with some assurance that it will be compensated for the time and expense it has spent in putting together its offer if the transaction is not completed for some reason, usually because another buyer appears with a higher offer. Such provisions may also encourage a prospective bidder to do the due diligence that is the prerequisite to any bid by assuring the prospective bidder that it will receive compensation for that undertaking if it is unsuccessful.

Not all of the purposes that break-up fees serve in corporate transactions are permissible in bankruptcy.

14

Although the assurance of a break-up fee may serve to induce an initial bid (a permissible purpose), it may also serve to advantage a favored purchaser over other bidders by increasing the cost of the acquisition to the other bidders (an impermissible purpose).

Moreover, even if the purpose for the break-up fee is not impermissible, the break-up fee may not be needed to effectuate that purpose. For example, in some cases a potential purchaser will bid whether or not break-up fees are offered. This can be expected to occur whenever a potential purchaser determines that the cost of acquiring the debtor, including the cost of making the bid, is less than the estimated value the purchaser expects to gain from acquiring the company. In such cases, the award of a break-up fee cannot be characterized as necessary to preserve the value of the estate. See generally , Bruce A. Markell, The Case Against Breakup Fees in Bankruptcy, 66 Am. Bankr. L.J. 349, 359 (1992).

D.

The Bankruptcy Court identified at least nine factors that it viewed as relevant in deciding whether to award Calpine a break-up fee and expenses, which we summarize as follows: (1) is the relationship of the parties who negotiated the break-up fee tainted by self-dealing or manipulation; (2) does the fee hamper, rather than encourage bidding; (3) is the amount of the fee unreasonable relative to the proposed purchase price; (4) did the unsuccessful bidder (Calpine) place the estate property in a sales configuration mode to attract other bidders to the auction; (5) did the request for a break-up fee serve to attract or retain a potentially successful bid, establish a bid standard or minimum for other bidders, or attract additional bidders; (6) does the fee requested correlate with a maximization of value to the Debtor's estate; (7) are the principal secured creditors and the official creditors committee supportive of the concession; (8) were safeguards beneficial to the debtor's estate available; and (9) was there a substantial adverse impact on unsecured creditors, where such creditors are in opposition to the break-up fee?

15

After weighing these various factors, the Bankruptcy Court concluded that Calpine had not met the requirements to recover break-up fees or expenses. Although the court found no evidence of self-dealing and concluded that "the requested break-up fee and break-up expenses [were] within the range of fees approved by some courts," it put most emphasis on its belief that approving Calpine's request for a break-up fee at the August 17, 1999 hearing would have "chill[ed] or at best certainly complicate[d] the competitive bidding process." In re O'Brien, slip op. at 39. The court further found that the Debtor, not Calpine or NRG, did the work of putting O'Brien into a sales configuration mode (the fourth factor), and noted that even before Calpine had emerged as a serious bidder, O'Brien solicited bids from numerous companies and pursued serious negotiations with at least five of them.

The court rejected any contention that the break-up fee provisions had attracted or retained a potentially successful bid, established a bid standard or minimum for other bidders, or attracted additional bidders (the fifth factor). The court noted that although it had originally been suggested by the Debtor that the break-up fee was needed to attract Calpine's bid, Calpine eventually decided to reenter the bidding after approval for that fee had been denied. Moreover, the court noted that the Calpine and NRG bids changed substantially over the bidding process, suggesting that Calpine's initial bid did not serve as a standard for other bidders.

Ultimately, "the Court [could] draw no correlation between the request for break-up fees and break-up expenses and the value ultimately brought to the estate by the competitive bidding process" (the sixth factor). Id. at 40. It did recognize that permitting Calpine to recover the fee and expenses would not injure unsecured creditors (the ninth factor) who will be paid in full in any event. It found, however, that awarding the fee and expenses would "have an adverse effect of holders of old equity of O'Brien by the dilution of at least a portion of the value that th[e] Court determined was provided to them pursuant to the successful NRG bid." Id. at 42.

16

E.

Rather than adopting the specific factors the Bankruptcy Court identified as the appropriate test to be used for all break-up fee determinations, we consider whether the record evidence supports the Bankruptcy Court's implicit conclusion that awarding Calpine break-up fees was not necessary to preserve the value of O'Brien's estate. As we have explained, that inquiry stems directly from S 503(b)(1)(A), which requires that an expense provide some benefit to the debtor's estate.

As we have recognized, such a benefit could be found if assurance of a break-up fee promoted more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited. Calpine argues that the fee and expenses were necessary to retain its bid and contends that it was improper for the Bankruptcy Court to draw a contrary conclusion from Calpine's decision to return to the bidding. We recognize that Calpine's decision to return to the bidding may have been influenced by the Bankruptcy Court's expressed willingness to reserve the question of fees for later determination. Nonetheless, when Calpine decided to reenter the bidding, it knew that it risked not receiving any break-up fees or expenses. Its decision to proceed in the face of this risk undercuts its current contention that it viewed the fees and expenses as necessary to make its continued involvement worthwhile. Indeed, the fact that O'Brien turned out to be worth at least $52 million more than Calpine's original bid (judging from what NRG was ultimately willing to pay) strongly suggests that it was the prospect of purchasing O'Brien cheaply, rather than the prospect of break-up fees or expenses, that lured Calpine back into the bidding.

Calpine also contends that its bid promoted competitive bidding by serving as a minimum or floor bid. Calpine's offer for the debtor's assets encompassed in the July 1995 agreement with the debtor was effectively the first bid, and by definition, the lowest, at least for that moment. The Bankruptcy Court, however, was not satisfied with the mere showing that later bids exceeded Calpine's initial one. Rather, the court required some showing that Calpine's bid

17

served as a catalyst to higher bids. We agree that this was a relevant inquiry and conclude that Calpine failed to make any such showing.

Arguably, if the availability of break-up fees and expenses were to induce a bidder to research the value of the debtor and convert that value to a dollar figure on which other bidders can rely, the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth. Calpine argues that it performed this research function and that the fee and expenses were necessary to induce it to do so. Calpine's argument ignores the fact that much of the information bidders needed to evaluate O'Brien was gathered by O'Brien itself at its own expense. Moreover, the record in this case suggests that Calpine had strong financial incentives to undertake the cost of submitting a bid, including the cost of researching the company's worth, even in the absence of any promise of reimbursement. We cannot conclude on this record that it was error for the Bankruptcy Court to find that the break-up fees and expenses were not necessary to induce Calpine's bid.

Finally, Calpine argues that the presence of competitive bidding during the O'Brien asset sale necessarily proves that the break-up fee and expense provisions did not chill the bidding, as the Bankruptcy Court feared. This is a logical fallacy. While it is true that bidding remained competitive in the face of uncertainty over whether such fees would be awarded, the bidding might have been even more heated had the court definitively ruled that Calpine was not entitled to a break-up fee or expenses earlier in the process. The results of the bidding therefore do not prove what effect the break-up fee and expense provisions had on other bidders' behavior. We note in this regard that NRG claims that its winning bid was no more than $1,000,000 higher than Calpine's final offer. See Appellees Cogeneration Corp. and Wexford's Br. at 21. If this claim is accurate, then the award of $4,250,000 in break-up fees and expenses certainly would have chilled the bidding by making NRG's bid, which otherwise would have been the winning bid, uneconomical.

18

The record thus adequately supports the conclusion that awarding break-up fees and expenses to Calpine was not actually necessary to preserve the value of O'Brien's estate, and because this is the dispositive inquiry in a bankruptcy case, we find no error or abuse of discretion by the Bankruptcy Court.

IV.

For the reasons set forth, we will affirm the order of the District Court denying Calpine's appeal from that decision.

A True Copy:
Teste:

    Clerk of the United States Court of Appeals
    for the Third Circuit