**In re FLEMING STEEL COMPANY, Debtors.**

**Spire Consulting Group, LLC, Movants**

**v.**

**Fleming Steel Company, Respondents.**

**No. 11–22292–JKF.**

United States Bankruptcy Court, W.D. Pennsylvania.

Nov. 14, 2012.

Alan E. Cech, Morella & Associates, Pittsburgh, PA, for Debtor.

Heather A. Sprague, Office of the United States Trustee, Pittsburgh, PA, U.S. Trustee.

## MEMORANDUM OPINION AND ORDER DENYING MOTION FOR ALLOWANCE OF ADMINISTRATIVE EXPENSES PURSUANT TO 11 U.S.C. § 503

JUDITH K. FITZGERALD,
Bankruptcy Judge.

Before the court is Spire Consulting Group, LLC's ("Spire") Motion for Allowance of Administrative Expenses. Spire previously filed a proof of claim alleging a "secured claim" in "quantum meruit" for services rendered to First Sealord Surety, Inc. ("First Sealord"), Debtor's surety. The motion for payment of administrative expense is based on the same facts and essentially the same legal arguments. Doc. Nos. 215, 233 (Supplemental). Debtor's objection to the claim (Doc. No. 180) was sustained (Order of September 5, 2012, Doc. No. 245) inasmuch as Spire was not a prepetition creditor, had no contract with the Debtor and had no lien or security interest. At the hearing on September 5, 2012, the court ordered counsel for Spire to file a brief with respect to arguments raised in the application and supplemental application for allowance of administrative expense, specifically to address

the question of whether admissible evidence existed to show that Debtor is a third-party beneficiary of the contract between Spire and First Sealord. However, Spire also contends that its claim should be allowed because the First Sealord/Debtor General Indemnity Agreement was assigned to it by First Sealord and that it is entitled to payment because otherwise Debtor would be unjustly enriched by the work Spire performed for First Sealord. We find that no evidentiary hearing is necessary inasmuch as there are no facts in dispute. We further find that Spire's application for allowance of administrative expense must be denied as no legal basis supports it.

A brief history is in order. In March of 2010 Debtor entered into an agreement with BE & K/Turner Joint Venture ("Joint Venture") for the manufacture and installation of hangar doors at the Boeing, Charleston, South Carolina, Expansion and Site Development Project, ("Boeing Contract"). Pursuant to the requirements of the Boeing Contract, Debtor entered into an agreement in July of 2010 with First Sealord for the issuance of a surety bond to secure its performance and insure payment of subcontractors and suppliers. The General Indemnity Agreement provided that First Sealord had a security interest in the proceeds of the Boeing Contract, Doc. No. 233, Exhibit A, ¶ 11, but First Sealord did not file a financing statement until after this Chapter 11 was filed on April 11, 2011. Accordingly, First Sealord did not have a secured claim. Because it never paid on the bond, despite demand

from Debtor's subcontractors and suppliers, First Sealord did not have an unsecured claim.[1]

During the course of Debtor's contract with the Joint Venture, Debtor "incurred unanticipated costs due to delays and acceleration caused and/or directed" by the Joint Venture resulting in "unanticipated costs to [Debtor] of approximately $965,071.00."[2] Doc. No. 251, Exhibit D, Letter dated December 12, 2011, from Seth Kohn, President, Fleming Steel Company to Daniel O'Brien, Controls Manager, Joint Venture. The December 12, 2011, letter also stated that, in addition to the above amount, Debtor was owed $272,952.00 on the original contract price which the Joint Venture had retained pending the closing of the Boeing Contract. By April of 2012 that amount increased to $277,352. Doc. No. 251, Exhibit C.

Debtor failed to pay all the subcontractors' invoices and three creditors filed claims against the surety bond as well as mechanics' liens. Two other creditors filed claims against the bond but did not file mechanics' liens.[3] So that subcontractors could be paid, the Joint Venture and First Sealord reached agreement for the release of the undisputed contract funds which the Joint Venture had retained, see Doc. No. 112, Exhibit, Letter of November 3, 2011, and in November of 2011 First Sealord filed a motion to approve payment of the subcontractor claims based on that agreement. Doc. No. 112. The Court entered an order on December 15, 2011, granting the motion. Doc. No. 133. Pursuant to the agreement and the order, $569,003 was

---

1. First Sealord did not file a response to Debtor's objection to its claim and an order was entered disallowing First Sealord's claim. *See* Doc. Nos. 181, 217.

2. Debtor's counsel communicated with counsel for the Joint Venture by letter dated April 12, 2012, offering to settle a claimed overage

in the amount of $965, 071 for $785,605. *See* Doc. No. 251, Exhibits C, D.

3. The subcontractors also filed litigation against the Joint Venture, First Sealord and unidentified others for the balance owed to them. Doc. No. 112 at 2, ¶ 8.

paid by the Joint Venture on behalf of First Sealord, as surety, with respect to the mechanics' liens. The total amount claimed by the Subcontractors exceeded $666,000.

In order to recoup amounts First Sealord would have to pay on the bond, it was necessary to get the Joint Venture to agree to pay the additional $965,071.00 in costs incurred by Debtor because of the Joint Venture's changes to the Boeing Contract. Debtor had contacted Spire [4] to inquire as to Spire's willingness to assist in preparation of the Change Order but never entered into a contract with Spire. On May 11, 2011, Spire sent the Debtor a Letter of Engagement whereby Debtor would retain Spire to assist in drafting a Change Order for the Boeing Contract. *See* Doc. No. 259, Exhibit A. The next day, May 12, 2011, First Sealord sent a letter to the Joint Venture directing that all future payments owed to Debtor be made to First Sealord. Thereafter, it was decided that Fleming would not retain Spire. We note that the Change Order would not benefit the estate inasmuch as (a) any recovery under a Change Order would go to First Sealord to reimburse it for the bond claims for which it was liable and the expenses it would incur in pursuing the Change Order; and (b) any monies remaining after such payment would be payable to First Commonwealth Bank which had a first lien on all assets of the Debtor.[5] Debtor advised First Sealord that Debtor had no interest in the Change Order, that the claim belonged to First Sealord, and that the Debt-

or would cooperate with First Sealord which would be liable for all expenses, including those relating to Spire. *See* Doc. No. 259.

Thereafter, First Sealord contracted with Spire to put together the Change Order for Debtor to present to the Joint Venture to recoup the additional costs and expenses. Acceptance of the Change Order by the Joint Venture was the only way First Sealord would recover what it would have to pay out on the bond in light of Debtor's inability to pay the subcontractors.

Although Spire began invoicing First Sealord in May of 2011, the two did not enter into a Letter of Engagement until August 4, 2011. However, First Sealord made no payments to any subcontractor under the surety bond and on February 8, 2012, the Pennsylvania Commonwealth Court ordered it into liquidation. That court also terminated the surety bond effective March 9, 2012.

*Administrative Expense*

■ In order to qualify for payment of an administrative expense under 11 U.S.C. § 503(b) the expense must be an actual, necessary cost of preserving the estate or must have been incurred in making a substantial contribution to the estate. The purpose of priority treatment for administrative expenses under § 503 of the Bankruptcy Code is to encourage parties "to continue to do business with a debtor post-petition," *In re North American Pe-*

---

4. The record contains a letter of April 19, 2011, Doc. No. 251, Exhibit A, and an email of May 2, 2011, *id.*, at Exhibit B, between Debtor and Spire whereby Debtor explained the circumstances and transmitted certain information Spire would need in order to quote Debtor a price for putting together the Change Order. Debtor, however, never entered into a contract with Spire to do the work.

5. First Commonwealth Bank's secured claim exceed $3 million. Under the plan of reorganization and a stipulation between the Bank and Debtor, First Commonwealth Bank was to be paid $1.75 million as a secured claim and the rest as unsecured. *See* Doc. Nos. 108, 166.

*troleum Corp. USA,* 445 B.R. 382, 400 (Bankr.D.Del.2011), and "to encourage third parties to provide necessary goods and services to the debtor-in-possession." *Id.* at 401. For a debt to qualify for payment as an administrative expense it must arise from a transaction with the debtor. *In re O'Brien Environmental Energy, Inc.,* 181 F.3d 527, 532 (3d Cir.1999). In this case, it is undisputed that Debtor disclaimed any interest in pursuing the funds owed by the Joint Venture. Doc. No. 259 at 5, ¶ 15. *See infra.* Moreover, it is undisputed that Spire did not contract with the Debtor, only with First Sealord. Spire had no arrangement with Debtor. It did not provide a necessary service to Debtor. Its contract with First Sealord and the purpose for which First Sealord engaged Spire was not to benefit or preserve the estate but solely to benefit First Sealord.

*Unjust Enrichment*

■■■ Spire argues that it is entitled to administrative claimant status because otherwise Debtor would be unjustly enriched inasmuch as Spire's work permitted Debtor to recoup money owed it on the Boeing Contract. "The responsibility for administrative expenses is based on the equitable principle of unjust enrichment, rather than compensation of the creditor's loss." *In re Funding Systems Asset Management Corp.,* 72 B.R. 87, 90 (Bankr. W.D.Pa.1987). Spire's efforts here are to compensate it for the loss it suffered when First Sealord went into liquidation. We find that Debtor was not enriched, unjustly or otherwise.

Black's Law Dictionary defines unjust enrichment as "[t]he retention of a benefit conferred by another, without offering compensation, in circumstances where

compensation is reasonably expected." Black's Law Dictionary, 1678 (9th ed. 2009). Spire never expected compensation from the Debtor until First Sealord went into liquidation. Spire's contract with First Sealord specifies that Spire was working SOLELY for First Sealord and contains a disclaimer that there are any third-party beneficiaries to the contract. Spire's counsel did not even enter an appearance in the bankruptcy until April 24, 2012, after the Pennsylvania Commonwealth Court cancelled First Sealord's bond on March 9, 2012. Spire's contract was with First Sealord, not the Debtor, and, as stated, First Sealord engaged Spire for First Sealord's benefit, not the Debtor's. Under the circumstances, Spire could not have "reasonably expected" compensation from Debtor.

We note that the agreement resulting in the release of the undisputed amounts owed to Debtor which the Joint Venture used to pay the mechanics' liens was between the Joint Venture and First Sealord. Furthermore, it was dated November 3, 2011, six months after Spire first began invoicing First Sealord in May of 2011. *See* Exhibit to Motion to Approve Payment of Certain Subcontractor Claims, Doc. No. 112, filed by First Sealord on November 15, 2011. The agreement between the Joint Venture and First Sealord also reserved to the Debtor and First Sealord the right to pursue recovery of additional funds "above the undisputed contract balance," *id.,* but Debtor disclaimed any interest in pursuing the funds. Doc. No. 259 at 5, ¶ 15.

The evidence establishes that, although the Joint Venture paid mechanics' lien claims in the amount of $569,002.74, the subcontractors were owed over $666,000. Further, the amount of $277,352 [6] that had

**6.** In the November 3, 2011, letter memorializ-

ing the Joint Venture/First Sealord agree-

been retained by the Joint Venture was included in the $569,002.74.[7]

A letter from Debtor's president to the Controls Manager of the Joint Venture dated December 12, 2011, noted that Debtor still was owed an amount[8] on the original contract (the retainage) but that Debtor had incurred additional costs of $965,071. On or about December 12, 2011, at First Sealord's request, Debtor submitted the request for a Change Order in that amount. Doc. No. 179 at ¶ 11.[9] As noted, after First Sealord defaulted on the bond, the Joint Venture paid the mechanics' liens as stated above but continued to dispute the change order request. By letter dated April 12, 2012, Debtor's counsel sent a settlement offer to the Joint Venture reducing the total claimed amount to $785,605 (which excluded the undisputed contract balance of $277,352) for a total of $1,062,957.00. Doc. No. 251, Exhibit C. Crediting the Joint Venture for the $569,003 which the Joint Venture had paid on the mechanics' liens, Debtor offered to settle for $493,954.00. The amount finally agreed on was $375,000 and on June 21, 2012, the Reorganized Debtor filed an emergency motion to approve a settlement with the Joint Venture in that amount. Although the emergency motion states that the "total value of the settlement to the Debtor is $666,650.74," Doc. No. 179 at ¶ 15, Spire's assertion that Debtor is "enriched" by this amount ignores the fact that Debtor was owed more than it recov-

ered. The $666,650.74 amount represents the amount paid on the mechanics' liens that exceeded (1) the amount of $277,352 retained under the contract that the Joint Venture and Debtor did not dispute ($291,650.74)[10] and (2) the $375,000 settlement amount. Adding the settlement amount of $375,000 to the $291,650.74 results in a payment to Debtor of $666,650.74, a shortfall of $298,420.26 of the total amount Debtor asserted it was owed. Thus, after crediting the Joint Venture for what it paid on the mechanics' liens and subtracting the undisputed amount, Debtor received payment of $666,650.74 on a claim that exceeded $960,000. Therefore, we find that Debtor was not enriched, unjustly or otherwise.

*Third–Party Beneficiary*

■ The letter of engagement between Spire and First Sealord, on Spire's letterhead and signed by Spire's principal Anthony Gonzales, expressly states that First Sealord is the client and that there were to be no third-party beneficiaries: "This Agreement is for the sole and exclusive benefit of the Client [First Sealord]. Unless stated below, no person or entity is considered to be a third-party beneficiary: 1. None." Doc. No. 259, Exhibit C, Letter dated August 3, 2011, from Spire Consulting Group to James A. Keating, counsel for First Sealord, at 3. There is nothing in the record to support the concept that Debtor was intended to be or was in fact a third-party beneficiary.[11]

---

ment, the retainage amount was stated to be $202,786. It increased thereafter.

7. The $277,352 was not part of the Change Order calculation.

8. The letter named a figure of $272,952 which later increased to $277,352.

9. One of the bases for Spire's assertion of entitlement to an administrative expense is that it delivered the Change Order directly to the Debtor but this ministerial act is not suffi-

cient to constitute a benefit to or preservation of the estate. 11 U.S.C. § 503.

10. That is, $291,650.74 was part of the overage.

11. We also note that from May 31, 2011, through December 31, 2011, Spire billed First Sealord, and only First Sealord, on a monthly basis. *See* Doc. No. 233, Exhibit C (invoices). The only reference to Debtor is on a September 27, 2011, invoice referring to a charge

*Assignment of First Sealord General Indemnity Agreement to Spire*

 Spire asserts that because First Sealord assigned its General Indemnity Agreement with Debtor to Spire, Spire is entitled to be paid under the terms of that agreement. Attached to Spire's Supplemental Application for Administrative Expense, Doc. No. 233, is an Indorsement Allonge which states:

> By execution of this Indorsement Allonge, and in consideration of the terms of the Assignment Agreement dated of even date herewith, First Sealord Surety, Inc., in Liquidation, does hereby assign, transfer, and sets over unto Spire Consulting Group, LLC, ... all of the right, title and interest of First Sealord ... in, to and under the General Indemnity Agreement ... by and between First Sealord ..., Fleming Steel Company....

identified as "Develop As-built schedule from Fleming's daily reports." There is not even a reference to delivery to Debtor which is one of the facts Spire relies on to hook its claim.

Furthermore, the confirmed plan of reorganization provided that First Sealord would look to the Joint Venture to satisfy its claim and any remaining amounts owed would be treated as an unsecured claim under the plan but First Sealord's claim was disallowed in its entirety because it had paid nothing on the bonds.

12. The Assignment Agreement between First Sealord and Spire was not provided to the Court but that does not affect the outcome inasmuch the assignment, evidenced by the Indorsement Allonge, occurred after First Sealord's claim had been disallowed.

13. Nonetheless, Spire relies on paragraphs 5 and 6 of the General Indemnity Agreement between First Sealord and Debtor. Paragraph 5 provides that Debtor will

> pay all charges and fees incurred by the Surety, its shareholders, directors, officers, partners, employees, agents, subsidiaries,

However, the assignment by First Sealord to Spire is dated August 3, 2012, *after* the objection to First Sealord's claim was sustained by order of this Court dated July 19, 2012. *See* Doc. No. 233, Exhibit A (General Indemnity Agreement with Indorsement Allonge dated August 3, 2012, attached), Doc. No. 217 (order of July 19, 2012, sustaining objection to First Sealord's claim). Spire's rights can rise no higher than those of its assignor.[12] *See, e.g., U.S. v. Tabor Court Realty Corp.,* 803 F.2d 1288, 1299 (3d Cir.1986), *cert. denied sub nom. McClellan Realty Co. v. U.S.,* 483 U.S. 1005, 107 S.Ct. 3229, 97 L.Ed.2d 735 (1987). Inasmuch as First Sealord had no claim against this estate, Spire can have no claim cognizable in this bankruptcy through First Sealord. There was no claim against Debtor that could be assigned.[13]

For the foregoing reasons, it is **ORDERED,** this **14th** day of **November,**

> Affiliates and divisions (and any surety that surety procures to execute any Bond and any other surety with which Surety may act as co-surety on any bond or other instrument) under any agreement to which any Indemnitor is a party.

Doc. No. 233, Exhibit A, at ¶ 5. (The Indemnitors are the Debtor and its principal(s)). However, when First Sealord assigned the General Indemnity Agreement to Spire, it had no claim. Spire cannot bootstrap a claim based on assignment of the General Indemnity Agreement when no claim existed that could be assigned, notwithstanding the language of the General Indemnity Agreement. For the same reason Spire's argument with respect to ¶ 6 of the General Indemnity Agreement which provides that Debtor is to hold harmless First Sealord "from ... all liability, ... damage, and expense" fails. Moreover, ¶ 8 of the General Indemnity Agreement provides that Debtor's liability extends to "the amount of all payments ... made by Surety ..." Doc. No. 233, Exhibit A at 2, ¶ 8. First Sealord made no payments. The contract must be read as a whole. Spire has no administrative claim.

2012, that the Application for Allowance of Administrative Expense is **DENIED.**