In re APP PLUS, INC., American Preferred Prescription Inc., American Preferred Plan, Inc., American Preferred Prescription–NY, Inc., American Preferred Prescription–FLA, Inc., American Preferred Prescription–GA, Inc., National Pharmacy Claims, Inc., Community Prescription Services, Inc., APP Pharmacy, Inc. and AP Plan–FLA, Inc., Debtors.

Bankruptcy No. 893–84170–478.

United States Bankruptcy Court,
E.D. New York.

Aug. 26, 1998.

871

Kenneth P. Silverman, Jaspan Schlesinger Silverman & Hoffman LLP, Garden City, NY, for Chapter 11 Trustee of the Estate of Substantively Consolidated Debtors.

Eugene Cimini, Jaspan Schlesinger Silverman & Hoffman LLP, Garden City, NY, for Chapter 11 Trustee.

Bruce Frankel, Angel & Frankel, P.C., New York City, for Biokeys II, Inc.

Alan Freid, Schwartzfeld, Ganfer & Shore, New York City, for Debtors.

Stephen H. Case, Davis Polk & Wardwell, New York City, for Procare, Inc.

David Wiltenburg, Hughes Hubbard & Reed LLP, New York City, for Tracar S.A.

John G. Loughnane, Goodwin Proctor & Hoar LLP, Boston, MA, for Advent.

Thomas P. McGowan, Meltzer Lippe Goldstein Wolf & Schlissel, Mineola, NY, for Cost Controls, Inc.

Joseph Samet, Baker & McKenzie, New York City, for Fulltime Holding Corp. and Ray and Eleanor Adiel.

John Westerman, Meltzer Lippe Goldstein Wolf & Schlissel, Mineola, for Ryan Management Corp.

Dwight Yellen, Ballon Stoll Bader & Nadler, New York City, for American Preferred Prescription, Inc.

## MEMORANDUM DECISION AND ORDER ON REQUEST FOR TOPPING FEE

DOROTHY EISENBERG, Bankruptcy Judge.

The Chapter 11 Operating Trustee moved this Court by Amended Order, dated July 29, 1998, Shortening Time and Fixing Dates, Times and Place of Hearings to Consider Motion for Further Orders Pursuant to Sections 363(b), 363(f) and 363(m) of the Bankruptcy Code and Fed. R. Bankr.P.2002(a)(2), 9006(c) and 6004:(1) Authorizing Trustee's Sale of substantially all of Debtors' Assets Free and Clear of all Liens, Claims and Encumbrances, (2) Authorizing the Trustee to Conduct an Auction to Sell Such Assets, (3) Authorizing the Trustee to Sell Such Assets to Biokeys II, Inc. or Any Higher or Better Bidder Pursuant to the Terms of an Agreement Dated July 28, 1998, (4) Approving a Break–Up Fee, Topping Fee and Certain Bidding Procedures, (5) Fixing Manner and Extent of Notice of Such Auction and Hearing and (6) Granting Related Relief (the "Scheduling Order"). The Scheduling Order, among other things, provided notice of two (2) hearings in connection with the Trustee's motion to sell substantially all of the Debtors' assets; i.e., a hearing to be held on August 12, 1998 (the "Procedures Hearing") to consider authorizing and approving, among other things, a Break–Up Fee, Topping Fee and Certain Bidding Procedures (collectively, the "Bidding Procedures") in connection with an auction sale to be held on September 28, 1998, as more fully described in the Trustee's motion and in the Asset Purchase Agreement (the "Purchase Agreement") entered into as of July 21, 1998 between Biokeys II, Inc. ("Biokeys"), as Buyer, and Kenneth P. Silverman, the Chapter 11 Trustee of the Debtors, as Seller.

After the Procedures Hearing duly held on August 12, 1998, at which the Court considered the Trustee's motion and the proposed Bidding Procedures, as well as the objections thereto filed by (i) Procare, Inc. ("Procare"), an indirect subsidiary of CVS Corporation; (ii) Fulltime Holding Corp. ("Fulltime") and Ray and Eleanor Adiel ("the Adiels"); and (iii) Tracar S.A. ("Tracar") and after hearing argument in favor of the motion by the Trustee, Trustee's counsel, counsel to Biokeys; and hearing argument in opposition by counsel to Procare, counsel to Fulltime and the Adiels, and counsel to Tracar; the Court approved certain of the proposed Bidding Procedures, including authorizing a Break–Up Fee of up to $250,000 in the event that Biokeys was not the approved purchaser. The Court's decision was memorialized in an Order (i) Specifying Terms and Conditions for Submitting Competing Offers; (ii) Approving Break–Up Fee, as requested; and (iii) Granting Related Relief (the "Procedures Order"), which was entered on August 13, 1998. The only matter not decided at the Procedures Hearing was the issue of whether this Court should approve a Topping Fee, as defined in the motion. The Trustee supported the request, but several interested parties, the Debtors and creditors objected to the allowance of the Topping Fee. The Procedures Order specifically states in paragraph 13 that the Topping Fee, if any, will be determined by the Court at a later date. This memorandum opinion constitutes the Court's findings of fact and conclusions of law in accordance with Fed. R. Bank. P. 7052, made applicable to a contested matter by Fed. R. Bankr.P. 9014.

## BACKGROUND

The Debtor and its affiliates operate retail, delivery and mail order pharmaceutical prescription businesses located in Melville, New York, Miami, Florida, Atlanta, Georgia, and New York, New York. American Preferred Prescription, Inc. (referred to herein as the "Debtor") filed a petition under Chapter 11 of the Bankruptcy Code on July 22, 1993. On March 8, 1996, the Court entered an Order confirming the Third Amended Plan of Reorganization of American Preferred Prescription, Inc. (the "Plan"), which provided for the payment of 100% of all allowed claims. On March 21, 1997, the Court issued a Decision and Order after trial awarding Cost Controls, Inc. ("CCI") $2,970,000 in compensatory damages, legal fees not to exceed $1,000,000, and punitive damages three times the amount of compensatory damages. Pursuant to CCI's application, on April 11, 1997, the Court appointed Kenneth P. Silverman as Trustee pursuant to Section 105 of the Bankruptcy Code, with certain limited powers, which powers were subsequently expanded by further Order of the Court authorizing him to settle or compromise claims after notice and hearing and approval by the Court.

On September 5, 1997, the Trustee commenced an adversary proceeding seeking the substantive consolidation of American Preferred Prescription, Inc. with its corporate parent and all entities under common control with American Preferred Prescription, Inc. (sometimes hereinafter referred to as the "APP Affiliates"). In response thereto, on December 1, 1997, the Trustee, American Preferred Prescription, Inc. and the APP Affiliates entered into a Secured Guaranty and Subordination Agreement (the "Guaranty Agreement") which, by its express terms and conditions, provided that upon the occurrence of certain specified material defaults by American Preferred Prescription, Inc. or one or more of the APP Affiliates, the Trustee could request the Court to enter judgment granting substantive consolidation.

After an extended trial, the Court found that American Preferred Prescription, Inc. and/or the APP Affiliates had materially defaulted under the Guaranty Agreement and, on June 19, 1998, entered a judgment substantively consolidating American Preferred Prescription, Inc. and the APP Affiliates. At a continued hearing held on June 22, 1998, the Court further found, based upon the conduct of American Preferred Prescription, Inc., that grounds existed to expand the authority and powers of the Trustee to that of a full operating trustee and, by "so ordering" the record of that hearing, the Trustee immediately assumed such authority and powers.

## FACTS

During the long history of this Chapter 11 proceeding, and particularly since CCI, a major creditor, was awarded its multi-million dollar judgment, the Court has repeatedly heard representations from the principals of American Preferred Prescription, Inc. and its counsel that American Preferred Prescription, Inc. was an extremely valuable business and that there were several parties interested in investing in the business and/or purchasing all or a portion thereof. However, such representations were never substantiated to the Court's satisfaction, since none of the interested parties went beyond discussions with the Debtor's principals and, although there appeared to be some parties interested in acquiring the Debtor and/or the APP Affiliates, none approached the Trustee with an offer until late June 1998, when the Trustee was given full authority as the operating Trustee of the Debtor and the APP Affiliates (the "Substantively Consolidated Debtors").

At the Procedures Hearing, the Trustee advised the Court that since having become the operating trustee of the estate of the Substantively Consolidated Debtors, he had been contacted by numerous substantial entities having an interest in purchasing the business and assets of the Substantively Consolidated Debtors, some of which prospective purchasers had previously been in discussions with the principals of American Preferred Prescription, Inc. The Trustee further advised the Court that the principals of American Preferred Prescription, Inc. had never disclosed the identities of any of the interested entities while the Trustee had only limited authority. By way of demonstrating such interest, the Trustee identified numerous substantial entities which have entered into confidentiality agreements with the Trustee to enable them to engage in due diligence regarding the financial condition of the Substantively Consolidated Debtors.

Biokeys 11, Inc. ("Biokeys") is the first bona fide offeror, having offered $20,000,000 for the assets and having signed a contract with the Trustee which binds Biokeys to furnish a $2,000,000 deposit, which will be forfeited as liquidated damages in the event Biokeys is unwilling or unable to consum- mate the closing. Biokeys is known colloquially as the "stalking horse". Biokeys is a newly formed corporation with no known assets, formed for the purpose of bidding and acquiring the subject assets for itself or its assignee.

As part of its negotiations with the Trustee, Biokeys requested a Break–Up Fee in an amount up to $250,000 subject to verification of such costs and expenses satisfactory to the Court to be paid to Biokeys in the event a higher or better offer to purchase the assets of the substantively consolidated Debtor is accepted by the Trustee and approved by the Court. It had further negotiated for the Trustee to pay to Biokeys a Topping Fee in the amount of $550,000 to be paid to Biokeys out of the sale proceeds in the event a higher or better offer to purchase the assets of the substantively consolidated Debtors in excess of $22,000,000 is accepted by the Court. In the event the Topping Fee is paid to Biokeys, no Break–Up Fee would be paid.

At the procedures hearing, counsel to Biokeys argued ably and eloquently that the Topping Fee would compensate Biokeys for the risk that its $20,000,000 offer would be used as a stalking horse to induce other bidders to top Biokeys' offer, while Biokeys had tied up $2,000,000 to make the required deposit and devoted its time, efforts and resources to consummate the proposed transaction.

The Debtor, and several creditors, objected to the Topping Fee for various reasons. Tracar argues that to more than double the Break–Up Fee of $250,000 merely because the sale process leads to an offer of $2,000,-000 more than the original bid proposed by Biokeys is to hand Biokeys more than 25% of the benefit to the estate.

The interests of other potential bidders were also represented at the hearing, all of whom argued in opposition to the Topping Fee. In addition, the Trustee represented to the Court and the Court accepts this as a fact, that he had received an unprecedented amount of interest from substantial entities regarding the business of the substantively consolidated Debtors, as evidenced by their having executed confidentiality agreements in connection with their due diligence and by the fact that several of such interested enti-

ties were represented by counsel who were present at the procedures hearing. It is anticipated that there will be several seriously interested bidders and that the ultimate highest and best offer will be substantially higher than Biokeys' offer.

At the hearing, there was little, if any, opposition to the Break–Up Fee and the Court approved the Break–Up Fee in an amount of up to $250,000, subject to verification of such costs and expenses satisfactory to the Court, and reserved decision on whether to permit the Topping Fee as requested.

## DISCUSSION

■■■ Break-up fees and topping fees, while not uncommon outside of the bankruptcy context, are relatively new within bankruptcy.[1] Those few bankruptcy cases that have addressed the issue have imported many of the legal principles applied by courts in the non-bankruptcy context, specifically in the takeover area. Break-up fees are the fees paid to the proposed purchaser of assets by the seller, in the event that the transaction contemplated fails to be consummated for various reasons delineated in the purchase agreement, including the seller's acceptance of a later bid. Typically, the break-up fee covers reimbursement of the disappointed purchaser's out-of-pocket expenses related to the proposed acquisition and/or compensation for the time, efforts, resources, lost opportunity costs and risks incurred by the disappointed purchaser. In contrast, a topping fee is paid *only* in the event another bidder is the successful purchaser. The amount of the topping fee is usually a percentage of the amount over the unsuccessful purchaser's bid. Since topping fees are based on the amount of the overbid, they do not usually add a preset cost to the purchase price.

### Rationale for Requesting Break–Up and Topping Fees

A. *Purchaser's Rationale:*

1. Such fees compensate the initial bidder for its legal and other professional fees and expenses incurred in connection with obtaining financing commitments, completing legal due diligence and negotiating and drafting agreements with the seller;

2. Compensate an initial bidder or the expenditure of its time, efforts and resources;

3. Compensate for the risk that the potential purchaser's offer will be used as a "stalking horse" to induce other purchasers to top the initial bidder's offer; and

4. Compensate the unsuccessful bidder for the risk of losing other business and investment opportunities while the bidding process unfolds.

B. *Seller's Rationale:*

1. Such fees may encourage the making of an initial "stalking horse" offer at a point where there are no competing bidders;

2. May discourage a bidding strategy designed to hold back competitive bids until late in the process;

3. Aid the seller in negotiating an initial bid that may be the offeror's highest bid;

4. May establish a high floor early in the bidding process; and

5. May enhance the bidding process by creating momentum towards the consummation of a sale.

■■■ In connection with the sale of assets in a bankruptcy context, the fiduciary duty of the officers and directors of the debtor-in-possession or, in this instance, the operating trustee, runs to the "diverse interests of the debtor, creditors and equity holders, alike." *In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir.1983). *See also In re America West Airlines, Inc.*, 166 B.R. 908, 909–10 (Bankr.D.Ariz.1994). Often, these interests differ, and must be evaluated by the bankruptcy court on a case-by-case basis. *In re Crowthers McCall Pattern, Inc.*, 114 B.R. 877, 881 (Bankr.S.D.N.Y.1990). Bankruptcy

---

**1.** The Court notes the written material and discussion by Joseph Samet, "Use of Break–Up and Topping Fees in Asset Sales," in Commercial Law and Practice Course Handbook, 121, 131–41 (Practising Law Institute 1996).

courts will carefully scrutinize the use of break-up fees and topping fees. *In re Integrated Resources, Inc.*, 135 B.R. 746, 750–51 (Bankr.S.D.N.Y.1992), *aff'd* 147 B.R. 650 (S.D.N.Y.1992), *app. dismissed,* 3 F.3d 49 (2d Cir.1993) (dismissed on jurisdictional grounds). *Integrated Resources,* the leading case on break-up fees, sets forth a three-part test: (1) Was the negotiation of the break-up fee tainted by self-dealing and manipulation? (2) Does the fee discourage rather than encourage bidding? (3) Is the fee unreasonable relative to the proposed purchase price? *Cf. In re Hupp Industries, Inc.,* 140 B.R. 191, 196 (Bankr.N.D.Ohio 1992) (the proposed break-up fee must be carefully scrutinized to insure that the Debtor's estate is not unduly burdened and that the relative rights of all the parties in interested are protected); *In re America West Airlines, Inc.,* 166 B.R. 908, 912–13 (Bankr.D.Ariz.1994) (bankruptcy court has the jurisdiction and responsibility to determine if the proposed break-up fee, and the transaction as a whole, make economic sense and are in the best interest of the bankruptcy estate, its creditors, bondholders and shareholders).

■ Due to a dearth of cases dealing solely with topping fees and although the bankruptcy courts in *Integrated Resources, Hupp Industries* and *America West* were grappling with break-up fees, this Court has been guided by their analysis in determining whether to approve a Topping Fee in this case. That is to say, in addition to the three-part test enunciated in *Integrated Resources,* this Court has also analyzed whether the proposed Topping Fee is unduly burdensome to the estate in view of the specific facts and circumstances of this case and whether it is in the best interest of the bankruptcy estate, the creditors, and the equity holders.

■ The Court finds that there has been no taint of self-dealing or manipulation in connection with the parties' negotiation of a Topping Fee. As to the reasonableness of the proposed Topping Fee relative to the proposed purchase price, the Court notes that the Purchase Agreement contemplates a preset Topping Fee in the amount of $550,000, to be paid in the event the Court approves a competing bid of at least $22,000,000 and the transaction actually closes. When viewed as a percentage of the successful overbid, if the

Court were to approve a competing bid of $22,000,000, the purchase price would be $2,000,000 higher than Biokeys' initial bid, and the Topping Fee would work out to 27.5% of the overbid, with the percentage decreasing as the successful overbid increases. If the purchase price would be $10,000,000 higher than Biokeys' initial bid, then the Topping Fee would work out to 5.5% of the overbid.

However, this Court must determine whether approval of a Topping Fee, in conjunction with the other Bidding Procedures in this case, will encourage rather than discourage the bidding, and whether it would enhance rather than detract from the ultimate maximum recovery to the estate. The Court believes that topping fees were intended to be awarded when, at the time the original offeror negotiated the contract with the debtor or the trustee, there were other known interested bidders that refused to be bound by a contract because they intended to bid only a little more than the initial bidder, who had diligently negotiated with the seller, so as to be the higher bidder. A Topping Fee may be justified to protect the estate from minimum bids by making such other interested parties bid substantially more for the assets in order to qualify as the higher or better offeror. However, in this case the Procedures Order provides that the minimum opening bid by any bidder other than Biokeys shall be $600,000 in excess of $20,000,000, and that subsequent bids shall be in increments of at least $100,000. With the substantial interest shown at the hearing and the representation of considerable interest by the Trustee, it appears likely that the bidding will exceed $22,000,000. The Court does not believe a Topping Fee would enhance the bidding, or result in any substantial benefit to this estate. Biokeys will be adequately protected for its position as "stalking horse" by the approval of the Break–Up Fee.

The Court finds that by virtue of the totality of the circumstances present in this case, it is in the best interests of the estate, the creditors and the equity holders that any augmented proceeds from the bidding process be used so as to effectuate the provisions of the Debtor's confirmed Plan; to pay the necessary and reasonable expenses of the

sale, including, if applicable, the Break–Up Fee already approved by this Court in the event that Biokeys is not the successful bidder; to pay the Trustee's professionals; all other appropriate expenses; and from the surplus, if any, to make such distribution to equity as may be appropriate and approved by the Court.

### CONCLUSION

1. This matter is before the Court pursuant to Section 363(b) of the Bankruptcy Code and Fed. R. Bankr.P. 6004.

2. Jurisdiction is conferred by 28 U.S.C. § 1334, and the proceeding is "core" by virtue of 28 U.S.C. § 157(b)(2)(A), (N) and (O).

3. The Court declines to approve the Topping Fee provided for in the Purchase Agreement entered into between the Trustee and Biokeys II, Inc. under the facts and circumstances present in this Chapter 11 proceeding.

4. The Court denies that portion of the Trustee's motion seeking to have the Court approve a Topping Fee in the event that Biokeys is not the successful bidder at the sale of the assets.

IT IS SO ORDERED.