# United States Bankruptcy Appellate Panel
## FOR THE EIGHTH CIRCUIT

_____

No. 02-6053 NI

_____

In re: Tama Beef Packing, Inc.          *
                                        *
          Debtor                        *
                                        *
AgriProcessors, Inc.                    *
                                        *   Appeal from the United States
          Interested Party-Appellant,   *   Bankruptcy Court for the
                                        *   Northern District of Iowa
          v.                            *
                                        *
Iowa Quality Beef Supply Network, L.L.C.*
                                        *
          Interested Party-Appellee,    *


_____

Submitted: February 5, 2003
Filed: March 21, 2003

_____

Before KRESSEL, Chief Judge, DREHER, and FEDERMAN, Bankruptcy Judges.

_____

FEDERMAN, Bankruptcy Judge.

_____

On August 20, 2002, the bankruptcy court denied appellant AgriProcessors, Inc.'s claim for administrative expenses, and on September 10, 2002, the bankruptcy court denied AgriProcessors' motion to alter or amend. AgriProcessors appeals both Orders of the bankruptcy court. We reverse and remand.

## FACTUAL BACKGROUND

On November 8, 2001, debtor Tama Beef Packing, Inc. (Tama) filed a Chapter 11 bankruptcy petition, and on December 18, 2001, the bankruptcy court converted the case to Chapter 7. Prior to the filing, Tama had negotiated a nonresidential real property lease with the City of Tama, Iowa (the City) in order to lease a special purpose meat-packing plant. The lease commenced on June 19, 2000, and ended on June 30, 2003. The rental payments under the lease totaled $1,080,000.00 to be paid as follows: $120,000 for the first year, payable at $10,000 per month; $360,000 for the second year, payable at $30,000 per month; and $600,000 for the third year, payable at $50,000 per month. On the petition date Tama had missed three monthly lease payments of $30,000 each.

On December 28, 2001, the Chapter 7 trustee filed a motion to extend the time to decide whether to assume or reject the lease with the City. The City objected to any extension and filed a motion to force the trustee to reject the lease immediately. The City claimed that it had accelerated the lease pre-petition due to Tama's default, and that the amount now due and payable was $937,749.70. The trustee responded that she was talking to several potential purchasers of the lease, and that she needed time to negotiate a sale. She also stated that the lease was the only asset of value in the estate, and that she had no liquid assets with which to cure the arrearage. The bankruptcy court ruled that the trustee had 60 days from the conversion, or until February 16, 2002, to assume or reject the lease, therefore, no extension was necessary.

On January 10, 2002, the City filed a request for a ruling that the trustee had made no post-petition lease payments, and it asked the bankruptcy court to order her to either immediately reject the lease or to make adequate protection payments. On January 25, 2002, the bankruptcy court denied the relief sought by the City and stated

2

again that the trustee had until February 16, 2002, to decide whether to accept or reject the lease.

On February 15, 2002, the trustee again moved the bankruptcy court for more time to decide whether to accept or reject the lease. With that motion, the trustee attached a Letter of Intent, also dated February 15, 2002, from AgriProcessors. The trustee stated that AgriProcessors was interested in purchasing the lease from the bankruptcy estate, but that it required 45 days to complete its due diligence. She, therefore, requested an extension of 45 days, or until April 23, 2002. The Letter of Intent stated that the purchase agreement would contain a provision that should another buyer acquire the lease by making the trustee a higher offer, AgriProcessors would be entitled to recover the costs it incurred in negotiating the transaction, in an amount not to exceed $50,000.

On February 19, 2002, the bankruptcy court entered an Order that granted the trustee an extension of 10 days, or until the court could schedule a hearing. On that same date, the City filed a motion asking the bankruptcy court to rescind its order of extension, precipitating a hearing on February 21, 2002. At the hearing on February 21, 2002, the trustee, the City, General Electric Capital Corporation (GECC), and AgriProcessors appeared by counsel. And, for the first time, Iowa Quality Beef Supply Network. L.L.C. (Iowa Beef) entered its appearance. On February 22, 2002, the bankruptcy court denied the City's motion, but in so doing the court noted that the lease was Tama's most significant asset, and that the trustee had received a commitment from GECC to lend monies sufficient to reimburse the City for its ongoing expenses.

On March 12, 2002, the trustee filed a motion to assume and assign to AgriProcessors Tama's unexpired lease with the City. The trustee attached the Assignment and Assumption Agreement (the Agreement) submitted by AgriProcessors. The Agreement provided that AgriProcessors would pay to the

3

trustee a minimum of $50,000 for disbursement to creditors of the estate. Section (9) of the Agreement contained a provision as follows:

> **9. Effect of Termination.** Notwithstanding any provision otherwise contained in this Agreement, the Bankruptcy Estate agrees that if the Agreement is terminated pursuant to Section 8(d) above, then AgriProcessors shall be entitled to submit an administrative claim to the Bankruptcy Court in an amount not to exceed $50,000 to allow AgriProcessors to recover a portion of its costs and expenses associated with this transaction.[1]

On March 12, 2002, the bankruptcy court held a hearing on the trustee's motion to extend time to assume or reject the lease and entered an order granting that motion in part and denying it in part. The court noted that the trustee had that day filed her motion to assume the lease and assign it to AgriProcessors. It also noted that, while Iowa Beef indicated that it had an offer on the table with the City, any benefit from that offer would flow solely to the City, not to the creditors of the bankruptcy estate. The court pointed out certain flaws in the Agreement. It found that the Agreement lacked commitment in that it offered no earnest money. The Agreement also failed to offer protection to the City for costs incurred since the first extension and prior to closing. The court, thus, refused to extend the time unless AgriProcessors posted an initial irrevocable payment in the amount of $100,000 as an advance under the provisions of the Agreement. The court then conditionally approved the motion to extend time provided AgriProcessors made an irrevocable payment of $100,000 to the trustee before March 15, 2002, at 4:30 p.m. AgriProcessors made the payment, and on March 15, 2002, the court entered a final order extending the time to assume or reject until April 12, 2002. In addition, at the trustee's request, the court clarified the nature of the $100,000 payment. The court held that, in the event the trustee accepted a higher offer from another purchaser, the trustee would return the sum of

---

[1]Appellant's Appendix, Trustee's Motion to Assume and Assign Unexpired Lease, Ex. A, ¶ 9, pg. 5.

4

$100,000 to AgriProcessors, otherwise, the $100,000 payment would be irrevocable and subject to disbursement by the trustee. While the court amended the Agreement by requiring an irrevocable payment from AgriProcessors, it did not disturb the termination clause.

On April 1, 2002, the City objected to the trustee's motion to assume the lease and assign it to AgriProcessors. As part of its objection, the City cited the termination clause in the Agreement. On April 3, 2002, the trustee amended her motion to assume and assign the unexpired lease. She still wished to assume the lease, but she now had received an offer from Iowa Beef, and so she wanted to delay her decision as to which entity would be the assignee. Iowa Beef had offered the trustee $110,000 for the assignment of the lease and the right to negotiate the terms for curing the default directly with the City. AgriProcessors objected to the trustee's motion to amend the motion to assume and assign on the grounds that the negotiating procedures were not clearly spelled out in her motion. On April 3, the court granted the trustee's motion to amend.

On April 18, 2002, the bankruptcy court granted the trustee's motion to assume the lease and assign it to Iowa Beef, the highest bidder. In its Order the court reiterated that it had previously expressed concerns about AgriProcessors commitment, and had only granted an earlier extension upon payment by AgriProcessors of an irrevocable payment of $100,000 to the trustee. By making that payment, AgriProcessors committed itself, at the direction of the court, to participate in the assumption and assignment process until the court either granted or denied the trustee's motion. In the end, Iowa Beef offered the trustee the sum of $153,000 for the assignment of the lease, while AgriProcessors offered the trustee $130,000.

On May 7, 2002. the court ordered the trustee to refund to AgriProcessors the $100,000 payment it had made on March 15, 2002. On June 3, 2002 AgriProcessors filed an application for payment of administrative expenses in the amount of

5

$46,964.99. On July 1, 2002, Iowa Beef filed an objection to the application.[2] On July 9, 2002, the bankruptcy court held a hearing at which the trustee fully supported AgriProcessors application. Nonetheless, on August 20, 2002, the court denied AgriProcessors' application. The bankruptcy court rested its decision on its determination that the actions of AgriProcessors had not benefitted the estate. The court further noted that outside of bankruptcy AgriProcessors would not have been entitled to be paid its cost of making its offer if it lost the bidding. On August 30, 2002, AgriProcessors filed a motion to alter or amend the court's Order, and on September 10, 2002, the court denied such request. On September 20, 2002, AgriProcessors filed its notice of appeal from both Orders.

## STANDARD OF REVIEW

A bankruptcy appellate panel shall not set aside findings of fact unless clearly erroneous, giving due regard to the opportunity of the bankruptcy court to judge the credibility of the witnesses.[3] The decision to award administrative expense priority is within the discretion of the bankruptcy judge.[4] We review such a decision for abuse

---

[2]No one questioned Iowa Beef's participation at the hearing of July 9, 2002. Iowa Beef stated it participated because it intended to hire some or all of Tama's former employees, and it wanted to protect their interest. There is no evidence that Iowa Beef itself was a creditor of Tama.

[3]*Gourley v. Usery (In re Usery),* 123 F.3d 1089, 1093 (8th Cir. 1997); *O'Neal v. Southwest Mo. Bank (In re Broadview Lumber Co., Inc.)*, 118 F.3d 1246, 1250 (8th Cir. 1997) (citing *First Nat'l Bank of Olathe, Kansas v. Pontow*, 111 F.3d 604, 609 (8th Cir.1997)). Fed. R. Bankr. P. 8013.

[4]*In re Gurley*, 235 B.R. 626, 636 (Bankr. W.D. Tenn. 1999); *In re American Preferred Prescription, Inc.*, 194 B.R. 721, 726 (Bankr. E.D. N.Y. 1996).

6

of that discretion.[5] A court abuses its discretion "when its ruling is founded on an error of law or a misapplication of law to the facts."[6]

DISCUSSION

In order to be entitled to administrative expense priority status, a party must prove two elements; first it must prove that it has a claim against the estate, and second that that claim arose as a cost of administration.[7] Here, because of the higher bid submitted by Iowa Beef, the bankruptcy court never entered an Order accepting AgriProcessor's Agreement, including the termination provision. Nevertheless, in the March 12, 2002, hearing on the motion to extend time, the court carefully considered the Agreement, modified it, and only granted the extension based upon AgriProcessors' commitment to abide by the modified terms. Since the resulting Order of March 15, 2002, committed AgriProcessors to comply with all terms of its Agreement, we believe that Order committed the estate to comply with such terms as well. We further believe that based on the Letter of Intent, coupled with the Agreement itself, the trustee had committed to pay AgriProcessors' costs and expenses, up to the specified sum, if AgriProcessors was outbid. Indeed, in its Order of August 20, 2002, the bankruptcy court stated that "[t]here is no dispute that the expense arose postpetition from a transaction with the estate. The attorney fees and other expenses arose in connection with AgriProcessor's [sic] attempt to acquire the

---

[5]*Kadjevich v. Kadjevish (In re Kadjevich)*, 220 F.3d 1016, 1019 (9th Cir. 2000); *Varsity Carpet Serv., Inc. v. Richardson (In re Colortex Industries, Inc.)*, 19 F.3d 1371, 1374 (11 Cir. 1994).

[6]*Montrose Medical Group Participating Savings Plan v. Bulger*, 243 F.3d 773, 779 (3rd Cir. 2001).

[7]11 U.S.C. § 503(b)(1); *United States v. Randall*, 401 U.S. 513, 515, 91 S. Ct. 991, 993, 28 L. Ed. 2d 273 (1971) (holding that the claims that will have priority in advance of payment to all other creditors are the costs and expenses of administration of the estate).

assignment of Debtor's lease with the City."[8] Neither party appealed that finding and such finding was, in any event, not clearly erroneous. We find, therefore, that the bankruptcy court correctly made a determination that AgriProcessors holds a post-petition claim against the bankruptcy estate.[9] The only remaining issue for us to decide on this appeal is whether the bankruptcy court abused its discretion when it refused to grant that claim administrative expense priority.

An entity is allowed an administrative expense for the costs and expenses incurred in preserving the bankruptcy estate:

> (b) After notice and a hearing, there shall be allowed administrative expenses, other than claims allowed under section 502(f) of this title, including–
>
> > (1)(A) the actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after the commencement of the case.[10]

Administrative expense claims are priority claims, thus, the allowance of those claims, in all but solvent estates, diminishes the recovery of other creditors and claimants.[11] Section 503(b) is, therefore, narrowly construed.[12] Nonetheless, the court

---

[8] Appellant's Appendix at pg. 260.

[9] *Calpine Corp. v. O'Brien Environmental Energy, Inc. (In re O'Brien Environmental Energy, Inc.)*, 181 F.3d 527, 533 (3rd Cir. 1999) (stating "we assume that bidding at a sale of O'Brien's assets constitutes a transaction with the debtor-in-possession for purposes of § 503(b)(1)(A)").

[10] 11 U.S.C. § 503(b)(1)(A).

[11] *Manufacturers Hanover Trust Co. v. Bartsh (In re Flight Transp. Corp. Securities Litigation), 874 F.2d 576, 581 (8th Cir. 1989).*

[12] *Id.*

must first decide whether the claim is, indeed, an actual, necessary cost and expense of preserving the estate. We have previously held that in making such a determination the court must consider whether (1) the expense arose from a transaction with the estate, and (2) whether it benefitted the estate in some demonstrable way.[13] Moreover, the creditor claiming administrative expense priority must prove that the expense provided a tangible benefit to the bankruptcy estate.[14] As stated above, the bankruptcy court found that the expense arose from a transaction with the estate, no party appealed that ruling, and, in any event, the finding was not clearly erroneous. We will, therefore, address only whether AgriProcessors demonstrated that the expense it incurred in its unsuccessful attempt to obtain an assignment of the lease from the trustee benefitted the estate in a demonstrable way.

In *Calpine Corporation v. O'Brien Environmental Energy, Inc. (O'Brien Environmental Energy, Inc.)*,[15] the Third Circuit dealt with the issue of the allowance of break-up fees as an administrative expense. It first defined the term "break-up fee" as a "fee paid by a seller to a prospective purchaser in the event that the contemplated transaction is not consummated."[16] The relevant facts of *O'Brien* are worth noting here. Ten purchasers submitted bids for *O'Brien's* assets and three were deemed highest and best. *O'Brien* then entered into a purchase agreement with Calpine Corporation. Calpine's obligation to perform under the purchase agreement was conditioned upon the parties' ability to obtain the approval of the bankruptcy court for a break-up fee of $2,000,000 and expenses up to $2,000,000 under certain

---

[13]*Williams v. IMC Mortgage Co. (In re Williams)*, 246 B.R. 591, 594 (B.A.P. 8th Cir. 1999) (citations omitted).

[14]*Id.*

[15]181 F.3d 527 (3rd Cir. 1999).

[16]*Id.* at 528.

9

circumstances.[17] The bankruptcy court refused to approve the break-up fee provision, holding that such a provision would chill, or at best, complicate the competitive bidding procedure. Calpine, despite the lack of approval, reentered the bidding process. Ultimately, another entity purchased *O'Brien's* assets, and Calpine filed an application for administrative expenses under section 503(b). The bankruptcy court denied the application and Calpine appealed. On appeal, the Third Circuit articulated all of the tests established by various courts to determine whether break-up fees should be permitted. For purposes of review, we will define these tests as (1) the business judgment test; (2) the best interests of the estate test; and (3) the administrative claim test.

The business judgment test developed outside the bankruptcy context, but it is applied by some bankruptcy courts. It provides for the payment of a break-up fee if (1) the debtor believes in its business judgment that such fees will benefit the estate; (2) there is no proof of self-dealing, and (3) there is no proof of specific harm to the bankruptcy estate.[18]

Under the best interests of the estate test the court should question (1) whether the bid is higher than it would have been had the break-up fee not been granted; (2) whether the break-up fee provided net value to the estate; (3) whether a break-up fee is necessary to start the bidding process; and (4) whether the amount of the fee is small relative to the overall benefit to the estate.[19]

---

[17]*Id.* at 529.

[18]*Id.* at 533 (citing *In re 995 Fifth Avenue Assoc., L.P.*), 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989)).

[19]*See* Bruce A. Markell, *The Case Against Breakup Fees in Bankruptcy*, 66 **Am. Bankr. L.J.** 349, 352 (1992). *See also O'Brien*, 181 F.3d at 534-35 (citing *In re America West Airlines, Inc.*, 166 B.R. 908, 912-13 (Bankr. D. Ariz. 1994).

After analyzing the two tests stated above, the Third Circuit found no justification for treating an application for a break-up fee any differently than an application for any other administrative expense.[20] In other words, the allowance of an administrative expense depends on the claimant's ability to show that the fees were actually necessary to preserve the value of the estate, or, as we have previously stated, that the fees benefitted the estate in a demonstrable way.[21] The *O'Brien* court identified the following nine factors that it viewed as relevant to its determination: (1) whether the relationship of the parties who negotiated the break-up fee is tainted by self-dealing or manipulation; (2) whether the fee hampered, rather than encouraged bidding; (3) whether the amount of the fee is unreasonable relative to the proposed purchase price; (4) whether the unsuccessful bidder placed the estate property in a sales configuration mode to attract other bidders to the auction; (5) whether the request for a break-up fee served to attract or retain a potentially successful bid, establish a bid standard or minimum for other bidders, or attract additional bidders; (6) whether the fee requested correlates with the maximization of value to the debtor's estate; (7) whether the principal secured creditors and the official unsecured creditors committee supported the concession; (8) whether there were safeguards beneficial to the debtor's estate; and (9) whether there would be a substantial adverse impact on unsecured creditors from approval of the administrative expense.[22] The Third Circuit then stated that, after considering all of the above factors, the appropriate test to be used in break-up determinations is whether the expense provided some benefit to the debtor's estate.[23] And the Court recognized that such a benefit could be found if "assurance of a break-up fee promoted more

---

[20]*O'Brien*, 181 F.3d at 535.

[21]*Id.*; *Williams v. IMC Mortgage Co. v. Williams (In re Williams)*, 246 B.R. 591, 594 (B.A.P. 8th Cir. 1999)

[22]*O'Brien*, 181 F.3d at 536.

[23]*Id.*

competitive bidding, such as inducing a bid that otherwise would not have been made and without which bidding would have been limited."[24]

We agree with the reasoning of the *O'Brien* court and hold that the determination of whether break-up fees or expenses are allowable under section 503(b)(1)(A) will be made in reference to general administrative expense jurisprudence. We previously held that such jurisprudence requires a showing that the claim benefitted the estate in some demonstrable way.[25] In order to determine whether the fees and expenses incurred by AgriProcessors did, indeed, benefit the estate we will apply the nine factors identified by the O'*Brien* court to the facts in this case.

The trustee negotiated the assumption and assignment agreement with AgriProcessors in an arm's length transaction. Until the time of the negotiation, no other entity had expressed any serious interest in purchasing the unexpired lease from the trustee. The estate had no assets to cure the default, and the City wanted the lease rejected. Thus, the relationship between AgriProcessors and the trustee was not tainted by self-dealing or manipulation.

There is no evidence that the break-up fee provision chilled the bidding process as to Iowa Beef. AgriProcessors did argue at the hearing that its final bid of $130,000 was, in fact, more than Iowa Beef's bid of $153,000 because of the break-up fee provision. That fact must be balanced against the fact that Iowa Beef preferred to negotiate directly with the City, and not the trustee, and the break-up fee provision was not relevant to that preference. We conclude, therefore, that the break-up fee provision neither hampered nor encouraged bidding.

---

[24]*Id.* at 537.

[25]*Williams v. IMC Mortgage Co. (In re Williams)*, 246 B.R. 591, 594 (B.A.P. 8th Cir. 1999) (citations omitted).

AgriProcessors submitted an application for fees and expenses in the amount of $46,964.99. That sum is large relative to the total purchase price of $153,000, but because the bankruptcy court found no benefit to the estate, it made no determination as to whether the fees were reasonable in the context of the fees and due diligence necessary to accept the assignment of a lease with a default in the neighborhood of one million dollars. We find that we have no evidence before us to decide if the amount of the break-up fee is reasonable or if the application properly accounted for the reasonable expenses incurred.

The fourth *O'Brien* factor, however, is the most significant factor in this analysis. Under the unique facts in this case the presence of AgriProcessors not only attracted another bidder to the auction, it is undisputed that there would have been no auction, or benefit to the estate, had AgriProcessors not agreed to participate.

The fifth factor asks whether the request for a break-up fee served to attract or retain a potentially successful bidder. The fact that AgriProcessors included this provision in both its Letter of Intent and the Agreement leads us to conclude that such a provision was integral to the negotiation. A contract fairly negotiated, unless illegal or against public policy, must be enforced according to the actual or legally presumed intention of the parties.[26] Every clause in a contract is presumed to represent the position of the parties. As noted, the bankruptcy court amended the Agreement by requiring AgriProcessors to make a $100,000 earnest money deposit. The court did not, however, amend the break-up fee provision. For these reasons, we find that, but for the provision, the trustee and AgriProcessors would not have reached an agreement.

AgriProcessors is the only potential purchaser who voluntarily negotiated with the trustee. As we found above, AgriProcessors would not have negotiated without

---

[26]**17A Am. Jur. 2d** *Contracts* § 650 n. 62 (citations omitted).

the break-up fee provision. We, therefore, find that there is a correlation between the request for the break-up fee by AgriProcessors and the fact that the trustee eventually realized $153,000 for an, otherwise, no-asset estate.

The seventh *O'Brien* factors concerns whether the principal secured creditors and the official creditors committee were supportive of the concession. The City did not support an assumption of the lease, but its position was unrelated to the break-up fee provision. There is no creditors committee, but the position of such creditors is represented by the trustee, who made the Agreement with AgriProcessors in the first place, and who argued on behalf of AgriProcessors at the hearing.

The eighth factor concerns whether the agreement contained safeguards beneficial to the estate. This particular provision was directly related to the actual fees and expenses incurred, and it was capped at $50,000.

Finally, we are asked to determine whether there would be a substantial adverse impact on unsecured creditors from approval, or whether the unsecured creditors were opposed to the break-up fee. AgriProcessors submitted an affidavit from the trustee that set out the current status of claims and receipts in this case. She stated that after all filed and allowed administrative claims are paid, she will be holding surplus funds in the amount of $53,453.73. The unsecured claims in this case are in excess of several million dollars. Thus, the allowance or disallowance of this claim will have little or no impact on the other general unsecured claims. Moreover, no unsecured creditors objected to the break-up fee provision. The trustee, who represents the unsecured creditors was not inclined to object, and did not do so, since the presence of AgriProcessors in this case created an administratively solvent, as opposed to insolvent, estate. Iowa Beef, the successful bidder, was the only participant who objected to AgriProcessors application. And Iowa Beef was forced by the bankruptcy court to negotiate with the trustee instead of the City. In essence, AgriProcessors presence caused Iowa Beef to expend an additional $153,000, as it was negotiating

14

directly with the City, and expected to obtain the lease as soon as the trustee rejected it. Moreover, there is no evidence before us that Iowa Beef was one of Tama's creditors.

We can only conclude from this analysis that the presence of the break-up fee provision conferred a benefit on this bankruptcy estate. The initial agreement with the trustee promoted competitive bidding in an otherwise no-asset estate. As a result of AgriProcessors' presence the trustee generated funds sufficient to pay all of the administrative expenses, including priority wage claims in the amount of $72,554.03. The bankruptcy court found that AgriProcessors failed to show that it was subjected to a loss as a result of the administration of the bankruptcy estate, and that the fees and expenses were incurred for the benefit of AgriProcessors alone. We find that the bankruptcy court misapplied the *O'Brien* test to the facts of this case. The inquiry is whether the provision, and, thus, the right to claim an administrative expense, provided a benefit to the estate. In this case, there is no question that AgriProcessors' participation resulted in a net benefit to the estate in the amount of $153,000. AgriProcessors, thus, satisfies the requirements of section 503(b)(1)(A) of the Code, and the bankruptcy court abused its discretion in denying its claim. We reverse and remand to the bankruptcy court for it to make a determination as to the reasonableness of the fees.

Before concluding, however, we address an argument made by the dissent. The dissent urges that there are actually three requirements for administrative expense status; first, there must be a claim that arises from a postpetition agreement with the estate; second, the claimant must have benefitted the estate; and third, the claimant must have complied with Section 364(b) of the Code by obtaining court approval to incur the debt. We do not disagree with the dissent's point, which is that approval is necessary to incur debt outside the ordinary course of business. We did not infer, however, that such approval was before the court at the March 12, 2002, hearing or that the court granted approval implicitly on that date. Our discussion of the court's

15

actions at that hearing relates solely to the issue of whether the court found that there was an agreement with the estate to make such payments, the first of the three elements mentioned. The dissent is correct, the propriety of the Agreement itself was not at issue at the March 12 hearing; it was before the court at the July 9, 2002, hearing. The bankruptcy court denied AgriProcessors an administrative expense for only one reason, its stated finding that the actions of AgriProcessors had not benefitted the estate. In this the bankruptcy court erred, and it is for this reason that we reverse and remand.

KRESSEL, Chief Judge, dissenting.

While I disagree with very little of the majority's legal analysis, I do disagree with its application of the law and think, as a result, it reaches the wrong result. Therefore, I feel that I must dissent.

I think the majority implicitly recognizes the principle that § 503(b)(1) is strictly a priority provision. It does not create any liability of the estate to an entity, it only grants priority to liabilities that meet the criteria listed in § 503(b)(1). This is in contrast to the provisions of § 503(b)(2), (3), (4), and (5), which do, in fact, deal with the liabilities of entities other than the estate and, by their terms, create both a liability of the estate and a priority for that liability.

As a result, in order to claim a priority under § 503(b)(1), an entity must first show that there is some sort of liability running to it from the estate. Thus, to qualify for priority status, a debt must be incurred by the debtor in possession or the trustee. *See*, *Matter of Jartran, Inc.*, 732 F.2d 584, 586 (7th Cir. 1984), citing *Reading Co. v. Brown*, 391 U.S. 471, 475 (1968). Admittedly, very few cases discuss this part of § 503(b)(1), but rather assume it or skip over it.

16

In this case, clearly the expenses that AgriProcessors wants paid out of the estate were not incurred by the estate in the first instance, but rather by AgriProcessors itself. Thus, if there were no more, its claim would clearly fail. A party who incurs expenses is not entitled to their payment as a § 503(b)(1) administrative expense.[27]

If the right circumstances are met, a trustee, on behalf of an estate, can incur an obligation to reimburse third parties for certain expenses they incur. The majority recognizes this principle as well and has held that because the agreement between the trustee and AgriProcessors contained a provision allowing it to apply for reimbursement of certain fees and expenses, that the trustee thereby incurred the obligation to make such a payment (subject, of course, to court approval). The agreement of course, does not explicitly provide that the trustee agreed to pay such expenses. It literally only provides that AgriProcessors could file an administrative expense claim, not to exceed $50,000.00. However, I would have to concede that the point that the majority implicitly makes: since any entity has the right to file an administrative expense claim, the most logical reading of that provision is that the trustee has agreed to its payment.

The trustee was not authorized to operate the debtor's business and, even if she were, this transaction would not be in the ordinary course of business. Therefore, § 364(b) is applicable to the incurring of a liability such as this one. That provision provides, in relevant part:

---

[27] Contrast this to provisions of § 503(b)(2) which would include as administrative expenses, compensation incurred by a creditors' committee for example or § 503(b)(3) which allows certain creditors to be reimbursed for certain expenses that they incurred.

> The court, after notice and a hearing, may authorize the trustee . . . to incur unsecured debt, allowable under section 503(b)(1) of this title as an administrative expense.

11 U.S.C. § 364(b). While not citing to this section, the majority concedes that court approval was required. It is here that I depart from the majority when it holds that the bankruptcy court gave its approval to the trustee incurring this debt. The majority concedes that the agreement between the trustee and AgriProcessors, in which this provision is found, was never explicitly approved by the bankruptcy court. The majority holds that, because the agreement was in the court file[28] and because the bankruptcy court placed additional conditions on the trustee's motion when it granted the motion, that that somehow constituted court approval of the incurring of this obligation by the trustee. I think this is unsupported by the record. Nothing indicates that this provision was explicitly or even implicitly approved by the bankruptcy court.

I think the implication in the majority's opinion that courts have an affirmative duty to speak up and express disapproval of things that are in the record, but not the subject of the actual hearing, places an impossible burden on bankruptcy courts. I also think it is bad law to hold that a court's silence can constitute implied approval. That is especially true in this case, since the agreement at issue was filed minutes before the hearing on the trustee's motion to extend the time for her to assume or reject the lease. The propriety of the agreement itself was not at issue at the March 12th hearing.

---

[28] The trustee filed her actual motion to assume the lease on March 12, 2002, the same day as the hearing on the trustee's motion to extend the time for her to assume or reject.

I concede the appropriateness of breakup fees in the bankruptcy sale process. It creates a significant incentive for possible bidders to get involved in purchasing property from a bankruptcy estate, thereby creating a stalking horse which often will increase the amount for which property can be sold. However, the terms of such breakup fees can be complicated and numerous and it is important, and I think required, that they be subjected to court scrutiny and approval before they are effective. Very often such breakup fees are tied to bidding increments so that the estate would not be put in the anomalous provision of either accepting a bid other than the highest bid or accepting the highest bid which results in a smaller net to the estate as would occur here under the majority's holding. AgriProcessors' last bid was $130,000.00 (net to the estate), while the winning bid submitted by Iowa Quality Beef Supply Network was $153,000.00 (net to the estate). Thus, while accepting the highest bid, the trustee actually would lose money if the provision for the payment of breakup fee is enforced.[29]

## CONCLUSION

Because I think the bankruptcy court correctly concluded that AgriProcessors was not entitled to an administrative expense claim under § 503(b)(1), I would affirm.

A true copy.

Attest:

CLERK, U.S. BANKRUPTCY APPELLATE
PANEL, EIGHTH CIRCUIT.

---

[29] It is, of course, much more complicated than that. One of the biggest things that Iowa Quality Beef Supply had in its favor was the support of the City of Tama, which was the landlord. It is clear from the record that the ability of the trustee to consummate a sale with AgriProcessors would have been much more difficult, if not impossible, because of the lack of support by the City of Tama.